201 P.2d 106

STRALOVICH v. SUNSHINE MINING CO.

No. 7436.

Supreme Court of Idaho.

Dec. 14, 1948.

E. B. Smith and Walter M. Oros, both of Boise, for appellant.

H. J. Hull, of Wallace, for respondent.

HOLDEN, Justice.

Antone Stralovich began working when about fifteen years old; he worked most of his life at underground mining in and around his home in Kellogg, Idaho, and around Butte, Montana. He worked intermittently for the Bunker Hill Mining and Smelting Co. in the Coeur d'Alene Mining District, mostly as a miner, sometimes in the   smelter from some time in

1918 to some time in 1934. At times during that period he was employed in other mines in the district. For a few months he was employed at other work, but returned to mining the latter part of the year 1935, working at various mines in the same district. In 1936 he did some underground work for the Anaconda Copper Mining Co. in the vicinity of Butte. Upon returning to his home in Kellogg, he was on W.P.A. for a time. In 1938 he again went to Montana for two or three months, where he worked underground at the Hidden Lake mine. In the latter part of 1939 he again went to work in Montana for the Anaconda, where he continued to work steadily underground until May, 1941. He began working July 8, 1941, for the Sunshine Mining Company, where he continued in steady employment underground until May 12, 1944, when he quit his job and ceased work as a miner.

Stralovich died January 8, 1946, leaving surviving him his widow, Mary Stralovich, and two minor children, Norma Jean and Joe Anthony Stralovich. March 25, 1946, Mary Stralovich, widow of Antone Stralovich, filed a claim individually and for and on behalf of Norma Jean and Joe Anthony Stralovich, minors, with the Industrial Accident Board, for "Compensation under the Workmen's Compensation Law and/or Occupational Disease". Compensation not having been agreed upon the matter was set for hearing and heard March 24, 1947. Following the hearing the matter was submitted on briefs. February 26, 1948, findings of fact and rulings of law were made and filed under the Occupational Disease Compensation Law (S.L. 1939, chap. 161, p. 286) and the following award entered thereon: "Wherefore it is hereby ordered that the defendant [respondent], Sunshine Mining Company, pay to Mary Stralovich for the benefit of herself and her minor children, Norma Jean Stralovich and Joe Anthony Stralovich, compensation death benefits at the rate of $12 per week for a period of 187½ weeks, beginning January 8, 1946, or until her death or marriage prior to the expiration of said period, computed as ending August 13, 1949". From that award claimant appealed to this court.

Before the Board, as above pointed out, claimant sought to recover workmen's compensation death benefits under the Workmen's Compensation Law, I.C.A. § 43-901 et seq., or, in the alternative, under the Occupational Disease Compensation Law. And respondent, before the Board, denied Stralovich received either a personal injury or contracted any occupational disease during the period he was employed by respondent, and insisted claimant was not entitled to recover either under the Workmen's Compensation Law or Occupational Disease statute. On this appeal, however, claimant insists "the death of Stralovich was caused by personal injury by accident arising out of and in the course of his employment (Workmen's

Compensation Law)," and that the Board erred in finding "that Stralovich died from a combination of miliary tuberculosis and silicosis". And, while respondent insisted before the Board claimant was not entitled to recover either under Workmen's Compensation Law or Occupational Disease statute, as above stated, it now insists said finding of the Board is supported by competent, substantial evidence, and, therefore, the award of the Board should be affirmed. In support of her contention the death of the deceased was caused by personal injury by accident arising out of and in the course of his employment, and consequently, the Board erred in awarding compensation under the occupational disease statute, claimant vigorously contends the evidence is insufficient to support the findings and award of the Board and, therefore, the Board should be reversed. In passing on these contentions, it seems advisable, in the circumstances, to first state the pertinent findings of the Board, followed by the material evidence upon which the Board based its findings.

The Board found "Stralovich died from miliary tuberculosis complicated with silicosis, and that his silicosis was an essential factor in causing his death". It also found "from the whole record herein that miliary tuberculosis and silicosis were co-equal factors to the death of Stralovich". And, having so found, the Board summarized as follows:

*"There remains for determination the issue whether Stralovich's complicated tuberculosis was 'tuberculosis of the lungs,' as that term is used in Sec. 43-2120, I.C.A. as amended. The claimant essayed to prove that the decedent's tuberculosis had its place of origin in the lungs.*

"According to Dr. Miller, in a case of miliary tuberculosis, 'there has to be a starting point.' That starting point is usually 'in and around the lungs.' While it may occur in other parts of the body, such an event is 'not very frequent,' it is 'very unusual.' 'If a man has miliary tuberculosis, in most instances there is a generalized infection and it involves the lungs as well as other tissues.' Asked if miliary tuberculosis can occur without any pulmonary complications and result in death, the doctor replied: 'Possibly, but I would say infrequently.' Further:

"Q. You are not basing your opinion upon any reaction you can see in this particular case? A. No, except that this man (had) silicosis to a marked degree.

"With respect to the origin and development of miliary tuberculosis in the usual case Dr. McCaffery was in general agreement with Dr. Miller. But owing to his inability to find or to demonstrate that the respiratory infection, which was present when he first examined the patient, was a pulmonary tubercular infection, Dr. McCaffery was of the opinion that this was the infrequent, the unusual case, which Dr. Miller's hypothesis admitted.

*"In an evaluation of the relative weight of the evidence the Board finds that the negative showing of the X-rays and the factual physical findings of the attending physician in this specific case are of more weight than the prima facie showing of opinion evidence of general application. \* \* \*"* (Emphasis added.)

That brings us to the evidence upon which the Board based its findings.

Dr. Glenn McCaffery, called by respondent, testified he examined Stralovich twice in December, 1945, before Stralovich was admitted to the hospital; that he had Stralovich under observation while in the hospital from December 26, 1945, to January 8, 1946, and during that time two chest X-rays were taken,—one December 28th and the other December 31, 1945; that in addition at least two sputum tests, blood cultures and serological tests and stethoscopic examinations of the chest were either taken by him or under his direction; that he attended Stralovich daily; that the blood cultures and stethoscopic tests were negative for typhoid or any other organisms; that the sputum tests were negative, no tubercular bacilli being found; *that the stethoscopic examination revealed nothing not in normal attendance upon silicosis of the degree suffered by Stralovich.* And, further, December 21, 1941, a pre-employment X-ray was taken of Stralovich under his direction. After testifying that in his opinion Stralovich's death was not caused by silicosis and that he refused to sign a death certificate to that effect, Dr. McCaffery testified as follows:

"Q. I observe in the deposition of Dr. Miller, which has been introduced here, that after being shown the Exhibits #2 and #3 [X-rays taken of Stralovich during December, 1945] Dr. Miller was asked this question: 'Now can you tell us, Doctor, in your opinion as to whether there is any infectious disease shown in that—I mean any disease other than silicosis?' And the doctor's answer was: 'I can't see any changes which are characteristic of any other disease.' I will ask you to examine those films and state whether or not you concur in that statement of Dr. Miller? A. That there are no other infectious diseases than silicosis?

"Q. Yes. A. That is my opinion, that there are no other infectious processes other than the silicosis that is present.

"Q. Dr. McCaffery, on his examination Dr. Miller was also asked this question, after having examined Exhibits #2 and #3: 'Now with reference to Claimant's Exhibit 3 or 2, I don't know whether I asked you the question or not, but was there any showing, in your opinion, of tuberculosis in those pictures,' to which Dr. Miller answered, 'On that particular examination—that is, the X-ray film—I cannot see on Exhibits 3 and 2 any characteristic shadows which would lead me to believe that tuberculosis was present.' I ask you now, Dr. McCaffery, if you agree

with Dr. Miller in that which I have just read? A. That is my opinion, that there is not any evidence of tuberculosis in those films."

Describing Stralovich's clinical condition, Dr. McCaffery further testified:

"The X-ray revealed no unusual—no change in appearance from the one Dr. Staley [an associate of Dr. McCaffery] had taken earlier. I will correct that. I think Dr. Staley looked up our previous film which was in 1941, and then in comparing that with our film of the 27th of December, 1945, *there wasn't any unusual amount of lung pathology which would account for the severity of his symptoms. This included abdominal examination and neurological examinations.* * * *

"Q. During the time Mr. Stralovich was in the hospital did you take any sputum tests? A. *There were two successive sputum tests taken on the 4th of January. I am confident of that, and I am sure others were taken. They were negative, no tubercular bacilli were found, and no one type of organism to call a pneumonic process, it was a mixed type of organism.*

"Q. During his last illness and confinement in the hospital, what was the general condition of this respiratory system, what were your findings? A. *For a man as ill as he was, we were unable to find much in his lungs other than what would normally be present with silicosis.* That is the reason we X-rayed him twice. We X-rayed on the 27th and on the 31st, I believe it was. The reason we took sputum samples, we wanted to type the organism and use special serum if it was a pneumonic process.

"Q. *You found no pneumonic process, is that correct?* A. *That is correct.*

\* \* \* \* \* \*

"Q. What examination of his chest did you make aside from the X-rays? A. Regular stethoscopic examinations were made of his chest.

"Q. What did they disclose? A. He had a definite increase of what we call bronchial tones, which is consistent of silicosis of the degree that he had. There were a few bronchial rales which are commonly heard in a chronic bronchitis. That is always associated with silicosis.

"Q. Aside from that condition of his lungs, his chest tests were normal, were they? A. That is right, I was unable to find anything unusual,—that is, enough to pin a diagnosis on. * * *

"Q. *Doctor, I ask you to examine Claimant's Exhibit #2, an X-ray taken December 28, 1945, and state whether or not that film shows any evidence of active pulmonary tuberculosis, or as the layman calls it, tuberculosis of the lungs.* A. *I don't interpret it as showing any activity of tuberculosis.*

"Q. *I will ask you to examine Exhibit #3 and ask you the same question with respect to it.* A. *In Exhibit #3 I see no*

*evidence of activity of tuberculosis in either lung. Did you say #1 also?*

*"Q. I will ask you the same question with reference to Exhibit #1, as long as you have it there? A. I see no activity of tuberculosis in Exhibit #1 in the lungs.*

*"Q. From your examination and observation of Mr. Stralovich in his last illness, in addition, or aside from these films, did you discover any indication of active tuberculosis of the lungs? A. No.*

\*    \*    \*    \*    \*    \*

*"Q. Doctor, from your observation of this patient, Mr. Stralovich, and from your examination, from the X-rays you have taken of him and your treatment of him, I will ask you to state whether or not in your opinion his death, Stralovich's death, was caused by silocosis complicated with tuberculosis of the lungs? A. No, I couldn't say that he had active tuberculosis of the lungs at all."* (Emphasis added.)

Dr. McCaffery then discussed the nature of miliary tuberculosis describing it generally as a blood stream infection resulting from the introduction into the bloodstream of tuberculosis from a theretofore localized tubercular area and then continued:

*"Q. If I understand you correctly, the source of this miliary tuberculosis, either acute or chronic, may be some other—may arise or be located at some other portion of the body than the lungs? A. That is true.*

*"Q. Is it a fact that miliary tuberculosis may occur as the result of tuberculosis infection breaking into the blood stream without any involvement of the lungs, or without any tubercular condition of the lungs prior to the miliary tuberculosis taking effect? A. That was my belief. \* \* \**

*"Q. It is a fact miliary tuberculosis very frequently has its source in the glands of the body? A. That is true.*

*"Q. And too, it may be glands in the abdominal region, it may be in the kidneys, it may be in the liver, is that correct? A. Yes, or the brain.*

\*    \*    \*    \*    \*    \*

*"Q. Doctor, one more question and I think I am through. Mrs. Stralovich testified this morning that during the year preceding Mr. Stralovich's death he declined in health, that is, his health became progressively poor. Now if that decline in his health had been the result of tuberculosis of the lungs, would that fact have been demonstrable by X-ray? A. I would think so.*

*"Q. And we might make it a little shorter. We find evidence of a tubercular lesion in Exhibit #1, I think that is clear enough, is it not, Doctor? A. I don't agree that it is necessarily a tubercular lesion. I agree it is calcified, but I don't agree it is a tubercular lesion."*

On redirect examination Dr. McCaffery reiterated his opinion. There was no evi-

532

dence of tubercular infection either from the X-ray or from the pathological tests.

Dr. Kenneth A. Tyler, also called by respondent, testified he was a graduate of Cornell Medical College; that for five years he was in charge of the Montana State Tuberculosis Sanitarium at Deer Lodge, Montana; that at the time of the hearing he was medical director of the Idaho State Tuberculosis hospital; that he had extensive experience with silicosis and silicotic tubercular patients and with examination of X-rays of such patients. Answering a hypothetical question based on the facts developed concerning Stralovich and upon examination of three X-rays marked Exhibits 1, 2 and 3, Dr. Tyler testified: *"* * * I see absolutely nothing to make me suspicious of an active pulmonary tuberculosis complicated by this man's found stage of silicosis. * * *

A. In the light of anything that has been brought out I would say there is no indication that the man's silicosis had any bearing on the man's death. He may have died of brain tumor, tuberculosis of the brain, he may have died of brain abscess. I can't see that the silicosis had any bearing on the man's death, on the cause of this man's death. Three things cause death among silicotics—silicosis, to my knowledge never killed anybody. There are three causes of death among silicotics, pulmonary tuberculosis, second, pulmonary arthritis, third, pneumonia, and there is no indication that this individual had any of those three most common causes of death."* (Emphasis added.)

On cross-examination Dr. Tyler adhered to his original opinion, testifying as follows:

"A. *There is no evidence he had an active pulmonary tuberculosis.* He might have had tuberculosis of the brain.

"Q. He could have had active pulmonary tuberculosis subsequent to December 31st? A. Not from December 31st to January 8th. Tuberculosis does not kill people that fast, not even miliary tuberculosis. Miliary tuberculosis takes two or three months. * * *" (Emphasis added.)

Dr. Frank S. Miller, called by appellant, after qualifying as an expert in silicosis pulmonary infections was handed claimant's Exhibits 1, 2 and 3, being X-rays of Stralovich taken by Dr. McCaffery, testified:

"Q. Now can you tell us, Doctor, in your opinion as to whether there is any infectious diseases shown in that [referring to Exhibit #3]—I mean any disease other than silicosis? A. I can't see any changes which are characteristic of any other disease.

"Q. There is a line shown in one side of the X-ray right across the middle of the lower third—upper portion of the lower third. Does that have any particular significance, Doctor? A. No. * * *

"Q. Now with reference to Claimant's Exhibit 3 or 2, I don't know whether I asked you the question or not, but was there any showing, in your opinion of tuberculosis in those pictures? A. On that particular examination—that is, the X-ray film—*I cannot see on Exhibits 3 and 2 any characteristic shadows which would lead me to believe that tuberculosis was present.* (Emphasis added.)

"Q. But from your examination of Exhibits 2 and 3—those were the X-rays taken in the month of December, 1945— *you didn't observe the presence of any infectious disease in the lungs?* A. *I don't see it on that particular examination.*

"Q. *And you said that is true on 2 and 3?* A. *The two later films.* \* \* \* (Emphasis added.)

"Q. I want to clear up a question I asked you at the outset that I am not clear on. It is a fact, is it not, that miliary tuberculosis can occur without any pulmonary or lung complication and a man die from it, is that not a fact? A. Possibly, but I would say infrequently, because the beginning of miliary spread must come from a pre-existing lesion which has many germs. \* \* \*

"Q. Your testimony to the effect that you consider silicosis had a good deal to do with this man's death is based upon the general proposition, is it not, that silicosis renders its victim more susceptible to certain diseases? A. Yes.

"Q. You are not basing your opinion upon any reaction you can see in this particular case? A. No, except that this man had silicosis to a marked degree."

Dr. Melvin Aspray, also called by appellant, testified: "Q. And in these films, Exhibits 2 and 3, do you see any indication of that type of tuberculosis? [meaning pulmonary tuberculosis.] A. I don't see any direct evidence of tuberculosis here. I can't say that tuberculosis does not exist in 2 and 3, but I don't see anything that would give me the impression that the patient had silicotic tuberculosis."

It appears from the above quoted testimony that Dr. McCaffery examined Stralovich before he was taken to a hospital; that Dr. McCaffery daily attended the deceased from the time Stralovich was taken to the hospital until his death; that during the time Stralovich was in the hospital two X-ray tests were taken, and in addition at least two sputum tests, blood cultures and serological tests and stethoscopic examinations of the chest were either taken by him or under his direction, which gave Dr. McCaffery first hand knowledge of the case, which no other physician had, who testified for claimant. In those circumstances, Dr. McCaffery was in a better position than one not having such first hand knowledge, to form an opinion as to the cause of deceased's death and, therefore, Dr. McCaffery's factual and opinion evidence was entitled to greater weight. Jensen v. Wheeler & England, 51

Idaho 91, 93, 94, 1 P.2d 624; Delich v. Lafferty Shingle Mill Co., 49 Idaho 552, 556, 290 P. 204. In other words, and as pointed out in Fackenthall v. Eggers Pole & Supply Co., 62 Idaho 46, 53, 108 P.2d 300, 302: "There should, and there ordinarily will be, more weight given to the testimony of one who testifies from first hand knowledge than will be given to the one who testifies alone on a hypothetical state of facts. Kelly v. Perrault, 5 Idaho 221, 232–240, 48 P. 45; Note 39 L.R.A. 333." Followed in Aranguena v. Triumph Mining Co., 63 Idaho 769, 773, 126 P.2d 17; Cain v. C. C. Anderson Co., 64 Idaho 389, 408, 133 P.2d 723.

Furthermore, and as appears from the above quoted evidence, Dr. McCaffery testified rather fully and positively the deceased did not die as the result of silicosis complicated with tuberculosis of the lungs as claimed and insisted by appellant. Moreover, Dr. McCaffery's opinion is supported by other medical evidence, to wit, Dr. Tyler, called by respondent, and by Drs. Miller and Aspray, called by appellant, as also appears from the above quoted testimony.

■■ Moreover, this court is firmly committed to the rule the members of the Industrial Accident Board are the triers of the facts—the final judges of the weight and credibility to be given the opinion of experts hypothetically stated, Cain v. C. C. Anderson Co., 64 Idaho 389, 409, 133 P.2d 723, and cases therein cited, and we are

also committed to the rule claimant has the burden of establishing the probable cause of death and, further, where there is any competent and substantial evidence to support the Board's findings, the findings will not be disturbed. Cain v. C. C. Anderson Co., supra.

■■ On the question of probabilities, and in particular on the question of the probable cause of death, attention is directed to the following quoted with approval from Walker v. Hogue et al., 67 Idaho 484, 490, 185 P.2d 708, 711: " 'The modern concept is that it is enough if the preponderance of the probabilities, according to the experience of mankind, points toward a causal relationship. Thus, where death follows soon after an injury to an able bodied man, there arises a presumption or natural inference that the death was caused by the injury, in the absence of believed, contrary testimony. And even though the only doctor who testified stated that there was no causal relation, an award to a claimant may stand, as the doctor may be disbelieved and causal relation inferred from the rest of the evidence.'—Horovitz 'Current Trends in Workmen's Compensation,' Reprinted from the Law Society Journal for August, 1947, Volume 12, No. 7, pages 658, 659 and 660."

Finally, where, as in the case at bar the facts and circumstances shown by the record are such as very well might lead different minds to reach different conclusions upon the issues presented; where-

·such is the case, however meager the evidence, if it is of a substantial nature and ·character, as in the case at bar, the findings ·of the triers of fact should prevail. Walker v. Hogue, supra.

Order affirmed, with costs to respondent.

GIVENS, C. J., HYATT, J., and TAYLOR and SUTPHEN, District Judges, ·concur.