200 P.2d 1014

**WARLICK v. DRISCOLL et al.**

No. 7461.

Supreme Court of Idaho.

Dec. 17, 1948.

Robert E. Smylie, Atty. Gen., and Glenn A. Coughlan, Asst. Atty. Gen., for appellants.

E. B. Smith, of Boise, and Frank L. Benson, of Craigmont, for respondent.

HOLDEN, Justice.

John Warlick, husband of claimant Mae Warlick, died suddenly and unexpectedly while at work August 11, 1947. October

9, 1947, she filed a claim for compensation with the Industrial Accident Board. January 13, 1948, claimant filed a petition for hearing her claim. The matter, by stipulation, was heard by the Board March 16, 1948. Following the hearing, to-wit, May 4, 1948, the Board made its findings of fact and conclusions of law and on the same day entered thereon the following award:

"Wherefore, it is hereby ordered that claimant, Mae Warlick, be and she hereby is awarded compensation against defendant, H. M. Driscoll, doing business as Idaho Bean and Elevator Company, employer, and State Insurance Fund, surety, and each of them as follows:

"Burial expenses of $200.00.

"Compensation of $12.00 a week for the period of 400 weeks from August 11, 1947, or, until her death or remarriage prior to the expiration of such period.

"The payment of any part of such award by defendant, surety, shall relieve defendant, employer, pro tanto."

Thereafter employer Driscoll and the State Insurance Fund appealed to this court from the said order awarding compensation.

The findings of the Board, so far as pertinent to this appeal follow:

"IV. During his lifetime Warlick enjoyed apparent good health until times hereinafter mentioned. He engaged in farm work, mainly, operated a farm of about 75 acres planted to hay and grain, near Peck, Idaho, performing the farm work himself, except occasionally he hired a helper during haying season, and performed other types of work, including railroad repair, county road maintenance, and unloading and piling grain at defendant employer's warehouse during season, at Peck, Idaho.

"V. During April, 1947, while plowing his farm land, using a land plow drawn by a team of horses, Warlick complained of and did suffer shortness of breath; he was unable to walk as fast as his team and frequently stopped to rest; at times he would lean over the plow while resting; at other times upon resting he would place his hands on his knees with feet placed apart, and would thusly rest while walking to his dwelling after plowing; once while leading calves to pasture he stopped, sat down and assumed a reclining position, leaning his shoulders against a post, at which time his face was drawn and pale; when abed his heart would 'pound.'

"VI. The warehouse season of defendant, employer, in the vicinity of Peck, Idaho, started during August, 1947, Warlick commenced working for defendant, employer, at its warehouse, Peck, Idaho, Friday, August 8, 1947, working that day and the next, Saturday, August 9; he did not work Sunday, August 10, but worked Monday, August 11, 1947. The weather was hot. During that time Warlick and another workman unloaded several truckloads of sacked grain at defendant, employer's ware-

house; each sack weighed about 135 pounds; also commenced and partially piled three piles of grain; each pile was 3 sacks wide and 5 sacks long, the sacks placed flatways end to end, and designed to be piled 10 sacks high. The work was heavy in nature and required workmen to become 'toughened in' at the commencement of the season. During that time Warlick appeared different in the performance of his work than during other times when he had worked at the warehouse; after lunch he would be out of breath and at times he would 'want to hold up a bit.'

"During the forenoon of Monday, August 11, 1947, Warlick and his companion started two grain piles; during the afternoon of that day they started a third pile; they used a hand cart, wheeling 5 sacks of grain at a time, then placed and piled the grain by hand two tiers high in the pile; then used a grain piler which mechanically lifted and placed the sacks of grain at about the middle of the pile. During the afternoon of that day Warlick worked in the middle of such partially built pile, and distributed manually, after delivery from the piler, the sacks of grain to proper positions. Shortly before 5:00 o'clock P.M. while he was so working, a customer came to the warehouse to obtain a sack of grain. Warlick's companion waited upon the customer, going to the front of the warehouse, was gone about five minutes from the scene of work; upon returning he found Warlick lying face down upon the sacks of grain where last he had been working. The companion climbed the pile of grain, turned Warlick over, felt his pulse, could not detect it, and could not detect breathing; he called a physician who arrived shortly after 5:00 P.M., and pronounced Warlick dead.

"VII. The physician who examined Warlick made a note on the back of the death certificate: 'This man was found lying on some grain sacks shortly after 5:00 p. m. He was seen by me at 5:30 P.M. and death was apparently of natural causes;' in the certificate he gave the immediate cause of death as a heart attack, which had occurred while Warlick was at work. He testified on behalf of defendants stating his opinion that Warlick suffered a coronary occlusion which caused death and, that a coronary occlusion is a violent injury to the heart; that exertion, in the case of a heart afflicted by coronary disease, is not necessarily harmful if it does not occasion pain to the patient.

"Another physician, called by defendants, testified that in his opinion Warlick had died from heart disease and, as is quite frequently the case, one may suffer a coronary from exertion; rest is essential for such condition; exercise beyond a man's capacity may cause death although a diseased heart may not be evident.

"A physician called by claimant testified that in his opinion Warlick should not have been working; the likelihood is that the

exertion caused death from the occurence of a coronary occlusion.

"Another physician called by claimant testified that in his opinion Warlick's symptoms of shortness of breath indicated an afflicted heart; the character of the work which Warlick had been performing at the time of death indicated sufficient exertion to precipitate the death from a coronary occlusion.

"VIII. John Warlick, August 11, 1947, received a personal injury caused by an accident arising out of and in the course of his employment by defendant, H. M. Driscoll, doing business as Idaho Bean & Elevator Company, employer, the effects of which accelerated the event of, and caused the death of Warlick that date."

It may be stated at the outset an autopsy was not performed for the purpose of determining the cause of the death of John Warlick. However, four physicians were called and testified, Dr. A. B. Pappenhagen and Dr. W. O. Clark for defendants and appellants, and Dr. John E. Carssow and Dr. Howard Rouse for claimant. All testified in response to hypothetical questions.

On direct examination Dr. Pappenhagen testified:

"Q. Now, Doctor, assuming those facts as true [stated in the hypothetical question], and also taking into consideration your own knowledge of this case [Dr. Pappenhagen immediately following Warlick's death was called and pronounced him dead], I will ask you if you have an opinion from a medical and surgical point of view and based upon a reasonable certainty whether or not there is any causal connection between Mr. Warlick's death and the work he was engaged in on the 11th of August?

    *     *     *     *     *     *

"Q. Will you state what that opinion is? A. I believe there is no connection between them. I do not believe that death was the result of work.

    *     *     *     *     *     *

"Q. And it is your best judgment this man died of a heart attack? A. That is correct.

"Q. That appeared to be to you the likely cause of death? A. That's right.

"Q. Now, Doctor, shortness of breath is one of the symptoms of some type of heart affliction, isn't it? A. Yes.

"Q. Particularly of a decompensated heart? A. A decompensated heart gives shortness of breath.

    *     *     *     *     *     *

"Mr. Smith: . . . The fact that the man died of what you think, in your opinion, was a coronary, that would indicate a heart other than normal, wouldn't it? A. That's right.

"Q. A heart affliction? A. Yes.

"Q. Anything that is out of normal, then it comes under disease or the so-called disease? A. Disease?

"Q. Yes? A. Anything that is abnormal is disease.

"Q. It comes under the category of disease, is that right? A. That is right.

\*   \*   \*   \*   \*   \*   。

"Q. And of course a coronary occlusion is immediately damaging, is it not, and sometimes to such an extent that the heart quits? A. That's right.

"Q. You have a sudden tremendous damage to the heart, isn't that right? A. Yes, the man died.

\*   \*   \*   \*   \*   \*

"Q. Doctor, the consensus of your testimony is to this effect, you don't believe the work had anything to do with this man's death? A. That is my opinion."

Dr. Clark testified on direct examination:

"A. What was given as the cause of death on the death certificate?

"Q. A heart attack, Doctor. Have you examined—I will hand you, Doctor, Claimant's Exhibit #1 which is the death certificate. A. Well, with the abbreviated history you have got here of this man's previous health, coupled with that death certificate, I would have to presume that that man died of heart disease.

"Q. Then, Doctor, is there any causal —would you say there is any causal relationship or connection between his work and his death? A. Well, there are a great many angles to be taken into consideration here. Apparently this man did not die during his period of severe exertion. Apparently this man was in his normal or regular condition when his companion left him and this attack came on while he was alone. It didn't occur during an effort syndrome, as we call it. It is possible that his death or heart attack was probably coincidental with his work. I believe there was one other incident that was recited there where the man got short of breath and sat down one time. Was that when he was out after some stock or something. It is a notable fact that a patient may be subject to heart disease over a period of years and have an occasional so-called heart attack—this may be momentary and he goes on and proceeds about his activities. My opinion would be that this man died of heart disease probably not aggravated by severe exertion. As I understand it with that activity he was engaged in there was about the usual effort, the usual labor used in the doing of the labor."

On cross-examination Dr. Clark testified:

"A. But I can't assume from what evidence has been given that this man was lifting 135 pound sacks at the time of his death. He was lifting and then resting. He was sitting on a sack when the man's assistant came out he was found dead. Once a coronary, always a coronary.

\*   \*   \*   \*   \*   \*

"Q. Well, heavy exertion quite frequently becomes a precipitating factor, doesn't it, Doctor,—not always, but fre-

quently? A. Of course, exertion beyond a man's capacity for endurance is probably not beneficial to anyone's heart whether they have a normal heart or a diseased heart.

"Q. If one has a diseased heart, under such circumstances the end result might be heart failure, might it not? A. Yes, and that might come any time. It might come during a period of exertion and it might come when he is at rest."

Dr. John E. Carssow testified on direct examination:

"A. If this man has—my opinion of this thing is,—I have two opinions, not alone as to the work. In the first place, I don't think the man should have been working. On the other hand, I think this could have been exertion, an emotional strain and have an effect on the coronary, not particularly on the occlusion, but the angina type. And the occlusion, it still could have had some effect on it. He may have had a small piece floating in the blood stream from some other place and it got to the heart, a small clot or a small portion of the artery broken off and got to the heart and caused sudden death. That would cause your coronary, and the angina would be the exertion and excitement. I don't know whether he had any excitement.

\*   \*   \*   \*   \*   \*

"Q. From a medical aspect, from a medical opinion, Doctor, it is to the effect that the man died of a coronary occlusion.

A. A coronary occlusion is different than an angina. In fact this man, the exertion could have loosened up a small infarct, that's what the body is termed, and ordinarily the infarct could have been swept up into the coronary vessel. That's the way it happened, and that is probably the way it happened if he had an occlusion. It was carried into the coronary artery."

On cross-examination, Dr. Carssow testified:

"Q. Doctor, in the absence of an autopsy here, it would not be possible to state what happened to this man, would it? A. That is true. It is hard to state whether it is an occlusion. You would have to draw a line whether it was a coronary occlusion. You take that coronary occlusion, you would say it had something to do with it, you would say it is possible,—it isn't absolute, but it is possible. He may have died from something else."

Dr. Rouse testified on direct examination:

"Q. \* \* \* what is your opinion as to the causal relationship of the death with reference to the type and character of work he [Warlick] was doing at the time? A. By that you mean the cause of death?

"Q. Yes, as to whether it has a causal relationship between the death and the work the man was doing? A. I think it was the work that caused the overexertion.

"Q. Responsible for what? A. His death.

"Q. The heart failure,—the cause of his death? A. Yes, the heart failure."

On cross-examination Dr. Rouse testified:

"Q. Then in the absence of this autopsy you are not able to state positively, are you, Doctor, the cause of his death? A. I can only give my opinion as to the history I have had.

"Q. You couldn't state positively without an autopsy? A. Absolutely not.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. Would you consider that heavy exertion, Doctor, where two men pile one pile of grain three sacks wide and five long and six high in an entire afternoon? A. Yes, I would, a man that age and if he was not used to it.

&ast; &ast; &ast; &ast; &ast;. &ast;

"A. You asked if I considered it heavy work [referring to the work Warlick was doing] and I said I did.

"Q. Don't you have to take into consideration the type of work the man has always done as a day laborer? A. In my opinion that is heavy work, I don't care who does it."

Summarizing, we find appellants' witness, Dr. Pappenhagen, by whose testimony they are bound, testified he did not believe there was any connection between the work Warlick was doing and Warlick's death, but thereafter, and on cross-examination, nevertheless, testified shortness of breath was one of the symptoms of some type of heart affliction; that a decompensated heart gives shortness of breath, and the fact that Warlick died, said Doctor Pappenhagen, as the result of a coronary occlusion, *would indicate* a heart other than normal; that anything that was out of normal would come under "disease"; and that "Anything that is abnormal is disease."

And, while Dr. Rouse, called in behalf of claimant, testified he couldn't state positively without an autopsy the cause of Warlick's death, he did testify, in substance, that in his opinion, the work Warlick was doing caused overexertion and that the overexertion was responsible for Warlick's death.

This court is firmly committed to the rule that the members of the Industrial Accident Board are the triers of the facts —the final judges of the weight and credence to be given the opinion of experts hypothetically stated. Cain v. C. C. Anderson Co., 64 Idaho 389, 409, 133 P.2d 723, and cases therein cited, and we are also committed to the rule claimant has the burden of establishing the probable cause of death and, further, that where there is any competent and substantial evidence to support the Board's findings, the findings will not be disturbed. Cain v. C. C. Anderson Co., supra.

On the question of probabilities, and in particular on the question of the probable cause of death, we direct attention to the following quoted with approval in Walker

v. Hogue et al., 67 Idaho 484, 490, 185 P.2d 708, 711:

" 'The modern concept is that it is enough if the preponderance of the probabilities, according to the experience of mankind, points toward a causal relationship. Thus, where death follows soon after an injury to an able bodied man, there arises a presumption or natural inference that the death was caused by the injury, in the absence of believed, contrary testimony. And even though the only doctor who testified stated that there was no causal relation, an award to a claimant may stand, as the doctor may be disbelieved and causal relation inferred from the rest of the evidence.'—Horovitz 'Current Trends in Workmen's Compensation,' Reprinted from the Law Society Journal for August, 1947, Volume 12, No. 7, pages 658, 659 and 660."

■ Furthermore, where, as in the case at bar, the facts and circumstances shown by the record are such as might very well lead different minds to reach different conclusions upon the issues presented; where such is the case, however meager the evidence, if it is of a substantial nature and character, the findings of the triers of fact should prevail. Walker v. Hogue, supra.

In the case at bar the evidence shows without contradiction that, at the time of Warlick's death, he and the foreman of the warehouse where Warlick was employed had been "lifting" and unloading several truckloads of sacked grain; that the sacks each weighed about 135 pounds. And there is evidence Warlick had an abnormal heart —a heart affliction; in fact, and as testified by Dr. Pappenhagen, Warlick had heart disease and died of a heart attack. And, further, there is also the evidence of Dr. Carssow that the work Warlick was doing caused overexertion and that the overexertion was responsible for Warlick's death. In other words, that the work Warlick was doing so accelerated and aggravated the diseased condition of his heart it precipitated the coronary occlusion which caused his death.

■ A recent case in point is Teater v. Dairymen's Cooperative Creamery, 68 Idaho 152, 190 P.2d 687. Teater drove a creamery truck. His work consisted of loading and unloading cream cans weighing when full from 100–110 pounds; loaded and unloaded butter in five-gallon packers weighing from 60–80 pounds each. Teater also had a heart affliction; in fact he had a background of medical treatment for heart trouble. At the time of his death Teater mounted his cream truck to the top of the cream cans and stood on the cans while a co-employee "tossed" five-gallon packers of ice cream up to the top of the cream cans, Teater stooped over, upended each packer of ice cream and lifted it a distance of six to eight inches onto the truck's deck; descending from the truck, Teater walked around to the back end, got into the truck cab, reeled back and forth, lay down on the truck seat, sat up again, then lay down again on the seat gasping.

His co-employee then went to the opposite side of the cab, straightened out Teater's right arm and called for help from the office. The office manager called a physician, who came at once to attend Teater; such physician, upon examination, pronounced Teater dead. And, as in the case at bar, no autopsy was performed to determine the cause of death.

The Teater case, supra, as an examination of the case will disclose, was *rested* upon the well considered case of In re Larson (decided some twenty odd years ago and followed ever since), 48 Idaho 136, 146, 279 P. 1087, 1090, where this court held that

"The strain [referring to the exertion which was the moving cause of Larson's death] may not have been unusual, and even slight, but, if it caused the death of the deceased, it was an accident that is compensable."

And, while Teater had a history of medical treatment for heart disease and Warlick did not, both had heart disease and both "lifted" and unloaded, Warlick, grain sacks, and Teater, milk cans and ice cream packers, and both died while at work of a heart attack. And, further, in the Teater case, supra, the same question was presented as is presented in the case at bar, to-wit: Did the exertion incident to the work being performed at the time of death cause an accident accelerating or aggravating the diseased condition of the heart, thereby precipitating coronary occlusion causing death? To repeat, there is competent, substantial evidence answering that question in the affirmative and, moreover, the Board found that issue in favor of respondent by awarding her compensation. And, finally, where, as in the instant case, there is a substantial conflict in the evidence, the findings and award of the Board will not be disturbed. Stroscheim v. Shay, 63 Idaho 360, 373, 120 P.2d 267; Zipse v. Schmidt Bros., 66 Idaho 30, 34, 154 P.2d 171; Cole v. Fruitland Canning Ass'n, 64 Idaho 505, 521, 134 P.2d 603, and cases there cited.

Order of the Board awarding compensation affirmed, costs to respondent.

GIVENS, C. J., HYATT, J., and TAYLOR and SUTPHEN, District Judges, concur.