414 P.2d 661

Elizabeth BRADSHAW, Claimant-Appellant,

v.

BENCH SEWER DISTRICT and Fireman's Fund Insurance Company, Defendants-Respondents.

No. 9753.

Supreme Court of Idaho.

May 25, 1966.

Coughlan & Imhoff, Boise, for appellant.

Moffatt, Thomas, Barrett & Blanton, Boise, for respondents.

SMITH, Justice.

This is an appeal from an order of the Industrial Accident Board denying to claimant-appellant recovery of workmen's compensation benefits.

Appellant seeks, on behalf of herself and her stepson, compensation benefits on account of the death of her husband, Hartley L. Bradshaw who, at the time of his death, was employed as an inspector by respondent, Bench Sewer District.

On September 8, 1960, decedent Bradshaw suffered an acute posterior myocardial infarction while working as a carpenter for Eaton Metal Company, and was hospitalized therefor until September 25, 1960; he then returned home where he convalesced until January 16, 1961. From that time until his death he continued to suffer from heart affliction. In the opinion of his attending physician and two other medical experts the heart disease and infarction were unrelated to the work which Bradshaw performed in his employment by Eaton Metal Company.

In June, 1961, respondent, Bench Sewer District, hired Bradshaw in a supervisory capacity as a plumbing inspector of sewer connections. For sometime he did little or no manual labor, but during 1963 and 1964 up to 35% of his work was manual.

During the early afternoon of August 24, 1964, Bradshaw went into his employer's office. In the words of the office bookkeeper, Bradshaw stated "he had lifted on a manhole and that he knew he would pay dearly for it." According to the bookeeper "his face was very discolored—just a purplish blue, and he seemed to be breathing quite hard, taking very long breaths." After resting for about 45 minutes, he returned to his work.

That evening Bradshaw was observed by his wife; he reclined on a daveno; he seemed short of breath and his color was not good; he did not eat the evening meal. Shortly after they had retired, Bradshaw got up and went into the front room. At that time he complained of "severe pain in his shoulder and down his arm—his left shoulder."

In the days that followed, Bradshaw no longer did yard or carpentry work at home. He was listless and did not eat well. He consulted his physician on September 3, 1964, who diagnosed an upper respiratory infection and an "anginal type of pain," and prescribed medication. Thereafter, except during the afternoon of September 4, 1964, when he remained home to rest, Bradshaw continued to perform his work for Bench Sewer District.

During the morning of September 9, 1964, Bradshaw and a co-worker, Joseph Williamson, were attempting to "alter or lower" a manhole top ring and cover. Bradshaw spent about 30 minutes using a "six-pound" pick to loosen the gravel around the manhole top. Williamson, shoveling the loosened gravel, had removed about six shovels full when he discovered Bradshaw slumped over. Williamson immediately summoned an ambulance. Bradshaw was pronounced dead upon arrival at a hospital. The death certificate stated that decedent died of "acute coronary occlusion" and that death was immediate to the onset of the affliction. An autopsy disclosed inter alia, that decedent had severe coronary arteriosclerosis with an acute thrombosis; also, old, recent and acute myocardial infarction. It was the thrombosis, causing the occlusion of the circumflex branch of the left coronary artery to which death was attributed.

Appellant duly filed a claim for compensation benefits on behalf of herself and her stepson, alleging that decedent's death was caused by an accident arising out of and in the course of his employment. After a hearing the Industrial Accident Board ruled that decedent's death "was not caused, aggravated, or precipitated by accident arising out of his employment * * *", and entered an order denying the claim. Appellant has appealed from such order.

Appellant, by assignment of error, asserts the insufficiency of the evidence to support the Board's ruling that Bradshaw's death was not caused by an accident arising out of and in the course of the employment.

I.C. § 72–201 provides in part:

" 'Accident,' as used in this law, means an unexpected, undesigned, and unlooked for mishap, or untoward event, happening suddenly and connected with the industry in which it occurs, and which can be definitely located as to time when and place where it occurred, causing an injury, as defined in this law.

"The terms 'injury' and 'personal injury,' as the same are used in this law, shall be construed to include only an injury caused by an accident, as above defined, which results in violence to the physical structure of the body. * * *"

■ "Among the elements essential to a claim for compensation under I.C. § 72–201, are an 'accident' * * * and causal relationship * * *." In re Sutton, 83 Idaho 265, at 268, 361 P.2d 793, at 794 (1961); Laird v. State Highway Department, 80 Idaho 12, 323 P.2d 1079 (1958); Whipple v. Brundage, 80 Idaho 193, 327 P.2d 383 (1958); Lewis v. Department of Law Enforcement, 79 Idaho 40, 311 P.2d 976 (1957); Swan v. Williamson, 74 Idaho

32, 257 P.2d 552 (1953); Warlick v. Driscoll, 68 Idaho 552, 200 P.2d 1014 (1948).

Medical reports, laboratory reports and physicians' reports relating to decedent's heart attack in 1960 were admitted in evidence as was a copy of the death certificate and the coroner's report. Appellant produced three physicians, viz., decedent's attending physician who was a general practitioner, a specialist in cardiovascular diseases, and the pathologist who had performed the autopsy. Respondents produced two physicians, specialists in internal medicine, including heart diseases.

The evidence as to the decedent's personal history, employment record and the medical reports is not in conflict; but it is in substantial conflict on the ultimate issue whether there was a causal connection between the decedent's work activity and the coronary occlusion to which death was attributed.

Dr. Thomas performed the autopsy. On direct examination, based upon his autopsy findings and hypothetical facts, he testified, as appellant's witness:

"* * * This is an individual [decedent] who has evidence of acute myocardial infarction, and if such an individual is subjected to intense physical activity dies suddenly during that physical activity, it is my opinion that the two are probably related, and the sudden

death and the physical activity—not the finding of the myocardial infarction."

On cross examination he stated a "clot" caused the occlusion, with resulting death; but he had "no idea" whether the exertion caused the clot. The following exchange then took place between appellant's counsel and the doctor:

"Q. Did the disease cause the clot?

"A. I think that is the basic process that produced the clotting.

"Q. Would you state, Doctor, based upon your experience, based upon your education, based upon a reasonable degree of medical certainty, that the clot was most probably caused or was probably caused by the diseased process?

"A. I think that is most probable."

Dr. Miner, an internist called by appellant, in answer to questions concerning the causal connection between decedent's lifting incident of August 24, 1964, and his work performed on September 9, 1964, on the one hand and his death on the other hand, testified:

"A. Yes, I think that can be summed up quite briefly—that as far as the lifting incident, I think it had no bearing on the cause of the heart disease in itself. Whether the lifting incident was an aggravating factor, or a precipitating factor in

the cause of his death, to me would be another question which would have to be answered differently, and I think this is in the realm of possibility certainly. * * *

"Q. Do you place this in the realm of probability, Doctor?

"A. Yes, I would place it in the realm of probability. I think as the term is usually referred to in connection with accident cases—compensation cases.

"Q. Doctor, would you explain the reasons for your answer?

"A. The reason would be that the man had a known existing heart disease and that he had enlargement of his heart, and already had considerable damage to his heart, and a heart that is already damaged, one then can possibly do further damage or might precipitate, we will say, an attack of angina, in particular, with certain types, particularly, of effort. * * *

"A. In effort, one may precipitate an attack of angina where we have pre-existing, or already existing heart disease, and such an effort could precipitate angina, and a person of course can die from angina pectoris.

"Q. What specifically, Doctor, could you relate it to this case, and could you give us specifically your opinion in regard to Mr. Bradshaw * * * does your answer apply specifically to Mr. Bradshaw in this case?

"A. I think it does, in that in his case he had a known heart disease previously, and we know that it was of a considerable extent and in our terminology we would say that it is quite possible that this effort could have precipitated a fatal angina attack, so in that sense it would apply. I should state that we use the term of possibility I think in much the same sense that you use the term of probability."

Dr. Burkholder, called by respondents, in answer to a hypothetical question which reviewed the history and events leading up to decedent's collapse, testified:

"A. In my opinion there was no relationship between the work of the patient and his death.

"Q. Would you state the basis for that opinion, please?

"A. The patient had extensive atheromatous heart disease, which means he had extensive plugging of all of the arteries, the plugging of the coronary arteries is the end stage of the degenerative arterial disease,

and that death occurs when these arteries completely plug up, and that death occurs regardless of time of day, or incidents."

On cross examination Dr. Burkholder stated that effort is unrelated to coronary occlusion; disease produces a coronary thrombosis; effort will not aggravate a coronary thrombosis or an occlusion. He then testified:

"A. Now, you also are talking about a different disease. You are not talking about a coronary thrombosis—you are talking about a coronary artery disease, where you can get stress and strain on the heart muscle due to exertion and this is not complete occlusion of the coronary artery that produces infarction.

"Q. Isn't this the condition Mr. Bradshaw had—one of the conditions?

"A. He had complete occlusion of his coronary arteries that produced his infarction. He did not have an infarction due to insufficiency, due to exertion and due to narrowing. His arteries showed they were completely clotted, thrombosed—completely occluded and this produced his infarction, * * *.

\*　　\*　　\*　　\*

I believe one can strain the heart with excessive exertion whether or not you have extensive coronary artery disease.

\*　　\*　　\*　　\*

But you do not have coronary thrombosis with occlusion as you have in this instance, due to stress and strain and work. * * * This disease happens any time of the day or night, regardless of what you are doing. * * * This occurs regardless of activities, factors."

Dr. Clifford, testifying for respondents, stated:

"A. I believe that Mr. Bradshaw * * had a pre-existing heart disease prior to 1960, at which time he had a well documented auricular fibrillation, * * * Mr. Bradshaw had an unfortunate but progressive disease of * * * the coronary arteries to the heart. * * * I do not believe that one could relate any event or act prior to or at the time of his death that could be related to this disease. He actually died of a recurrent—an extension of his original disease, and he developed a coronary thrombosis, an occlusion of the coronary—and died."

On redirect examination, Dr. Clifford testified:

"Q. Doctor, in this particular case, in view of the findings I believe, of a clot, which would be a thrombosis, the clotting of the coronary artery, what effect, if any, did the activity described in this instance have on the death?

"A. I don't think it had any. I think that this would have occurred spontaneously under any and or all circumstances."

and on recross examination his testimony appears:

"Q. Doctor, your last answer, I take it, you feel that this occurred coincidentally with the time that he was swinging the pick—while he was swinging the pick he just coincidentally had heart failure and died?

"A. I think it would be coincidental. I don't think that there is a causal relationship, * * *.

* * * * * *

"Q. * * * but it will be the precipitating cause of the death—one of the precipitating causes?

"A. Not in this instance, * * * I do not believe so, although I do believe that you and I could go up here hunting tomorrow and I think we could kill ourselves but we wouldn't have a diseased coronary artery with occlusive disease of this vessel and thrombosis. We may have a myocardial infarction, produced on severe exertion with normal blood vessels, but that is not a clot that shut off Mr. Bradshaw— he died of a disease."

 Where the determination of the cause of decedent's death is dependent upon the opinions of the medical experts called by the respective parties, the opinions of such witnesses founded upon facts and recognized medical theories constitute competent evidence upon which the Industrial Accident Board may base its findings and its ultimate conclusion. Bennett v. Bunker Hill Company, 88 Idaho 300, 399 P.2d 270 (1965); Walker v. Hogue, 67 Idaho 484, 185 P.2d 708 (1947); Cameron v. Bradley Min. Co., 66 Idaho 409, 160 P.2d 461 (1945). The Industrial Accident Board is the arbitrator of disputed and conflicting facts and opinions, and its determination when supported by competent, substantial, though conflicting, evidence will not be disturbed on appeal. Idaho Const., Art. 5, § 9; I.C. § 72–609; Lindskog v. Rosebud Mines, Inc., 84 Idaho 160, 369 P.2d 580 (1962); Clevenger v. Potlatch Forests, Inc., 82 Idaho 383, 353 P.2d 396 (1960); Moeller v. Volco Builders' Supply, Inc., 81 Idaho 349, 341 P.2d 447 (1959); Miller v. Bingham County, 79 Idaho 87, 310 P.2d 1089 (1957);

Oliver v. Potlatch Forests, 73 Idaho 45, 245 P.2d 775 (1952). There is substantial, though conflicting, evidence in support of the board's finding; therefore, the assignment of error is without merit.

■■■ Appellant assigns error of the Board "in accepting medical testimony on hypothetical basis as opposed to that of the attending pathologist" in arriving at its decision. In support thereof, appellant urges the rule that ordinarily more weight will be given to the testimony of one who testifies from first hand knowledge than to that of one who testifies only upon a hypothetical state of facts. Graves v. American Smelting & Refining Company, 87 Idaho 451, 394 P.2d 290 (1964); Stralovich v. Sunshine Mining Co., 68 Idaho 524, 201 P. 2d 106 (1948); Cameron v. Bradley Min. Co., supra. This rule is akin to the rule that positive evidence is entitled to more weight than negative evidence. Both are procedural evidence rules. In Bennett v. Bunker Hill Company, supra, this Court stated:

"The rule that positive evidence is entitled to more weight than negative evidence may be employed as a guide by the finder of the facts in evaluating testimony in resolving factual issues, but it has no place in this court's appellate examination of a record in view of the constitutional and statutory limitations upon the scope of review. [In compensation cases, Idaho Const., Art. 5, § 9 and I.C. § 72–609] The weight to be given the testimony, the credibility of the witnesses and the reasonable conclusions and inferences to be derived from the record are peculiarly within the province of the board, and not of this court. [Citations] This court's review of a record is solely for the purpose of determining questions of law, including whether there is substantial, competent evidence to sustain the findings of the board, and not to evaluate or settle conflicts in evidence or reasonable inferences to be drawn therefrom." 88 Idaho at 306, 399 P.2d at 273.

Moreover, "[n]egative evidence is entitled to consideration unless it 'is so destitute of probative value that it will not be received.' " Ralph v. Union Pacific Railroad Company, 82 Idaho 240, at 247, 351 P.2d 464, at 467 (1960); Kerby v. Oregon Short Line R. Co., 45 Idaho 636, 264 P. 377 (1928).

The pathologist, who performed the autopsy, based his opinions on a hypothetical question; also, he admitted, on cross examination, that he had "no idea" what caused the clot to form; although ventured the opinion that the heart disease was "the probable cause of the formation of the clot."

■■■ The members of the Industrial Accident Board are the final judges of the weight to be given the hypothetically stated opinions of experts. Stralovich v. Sunshine Mining Co., supra; Cameron v. Brad-

**566**

ley Min. Co., supra; Cain v. C. C. Anderson Co., 64 Idaho 389, 133 P.2d 723 (1943).

The order of the board denying compensation is affirmed. Costs to respondents.

McFADDEN, C. J., and McQUADE, TAYLOR and SPEAR, JJ., concur.