399 P.2d 270

Dorothy BENNETT, formerly Dorothy Lunsford, on her own behalf as surviving widow of Leonard Lester Lunsford, Deceased, and as natural guardian of William Leonard Lunsford, minor dependent of deceased, Plaintiff-Appellant,

v.

The BUNKER HILL COMPANY, Self-insured employer, Defendant-Respondent.

No. 9315.

Supreme Court of Idaho.

Feb. 17, 1965.

McClenahan & Greenfield and Gideon H. Oppenheimer, Boise, for appellant.

302

Brown, Peacock & Keane, Kellogg, for respondent.

McFADDEN, Justice.

Claimant Dorothy Bennett, appellant herein, was formerly Dorothy Lunsford, the widow of Leonard Lester Lunsford, deceased. She filed a claim for benefits under the Occupational Disease Compensation Law (Chapter 12, Title 72, I.C.) following the death of her husband, on her own behalf and as the natural guardian of William Leonard Lunsford, a minor child of herself and decedent.

Leonard Lunsford, an employee of The Bunker Hill Company, respondent (herein referred to as the company), died February 10, 1961. The claimant contends that her former husband's death, which was caused by a coronary thrombosis, was complicated with lead poisoning, an occupational disease, contracted by him by reason of injurious exposure to the hazards of lead dust in the course of his employment and that she is entitled to benefits under the statute. Hearings were held before the Industrial Accident Board on the issues presented by her petition for hearing and the company's answer thereto. The Board entered its order denying the claim, from which order claimant appealed.

The basic issue before the board was stated to be:

"Was the death of the workman, Leonard Lester Lunsford from coronary thrombosis, a disease noncompensable under the Occupational Disease Compensation Law (and not herein attributed to an accidental cause) accelerated or in any wise contributed to by lead poisoning, a compensable occupational disease?"

In her appeal claimant asserts that certain findings of fact entered by the board are unsupported by the evidence; that the board's ruling of law is not based on substantial, competent evidence; and that the board's findings of fact do not, as a matter of law, support its order denying her claim. Her assignments of error encompass these assertions.

Many of the facts before the board are without dispute and can be summarized as follows: The decedent, Leonard Lunsford, was first employed by the company in April 1955 and worked until June 1956, during which period he was employed in the company's lead smelter. He quit in June 1956 and returned to his former home in Arkansas, where he remained until August 1959. The nature of his work in Arkansas does not appear.

On August 12, 1959, the decedent resumed employment with the company in its smelter and continued in this work until May 5, 1960, when a strike caused suspension of the company's operations. The strike continued approximately seven and a half months, during which period of time the decedent worked as a pond man for a sawmill at Craigmont, Idaho. He resumed his employment with the company on December 27, 1960, and continued working for the com-

pany until February 10, 1961, the date of his death, at which time he was 52 years of age. His employment was in the smelter as an assistant conveyor operator, unloading cars. No autopsy was performed.

A number of medical reports, a copy of his death certificate, laboratory reports of his urine samples, and hospital and clinical records pertaining to decedent were admitted in evidence. The testimony of five doctors was submitted to the board for consideration, claimant's medical witnesses being Dr. Myhre, a physician practicing at Spokane, Washington, whose specialty is that of internal medicine; Dr. Ward, a physician practicing at Boise, Idaho, a general practitioner; and Dr. Helen Beeman, a pathologist of Boise. Dr. Whitesel of Kellogg was the decedent's attending physician during the years in question and was a witness for both the claimant and the company. Dr. Staley, a general practitioner at Kellogg, was called as a witness by the company.

There is no substantial conflict in the record as to the decedent's personal history, employment record and medical reports; however, there is a marked conflict in the opinions expressed by the various doctors on the ultimate issue of whether there was a causal connection between the decedent's record of "lead poisoning" and the coronary thrombosis which was the ultimate cause of his death.

The medical record shows that Mr. Lunsford was hospitalized twice during his employment with the company. The first time was in October 1959 for acute appendicitis. An appendectomy was performed and he was away from his employment for about a month. The second time he was hospitalized was in December 1959 when he was suffering from acute plumbism. He remained in the hospital about six days and was treated by medication and rest. A week after his discharge from the hospital he was again examined by his attending physician, Dr. Whitesel. A few days later he was released to resume his employment and did go back to work either in the latter part of December 1959 or the first part of January 1960. His attending physician advised that he not return to work in the company's lead smelter but that he seek work in the company's zinc plant. However, there was no opening for him in the zinc plant; whereupon the supervisor at the smelter consulted Dr. Whitesel about allowing Lunsford to return to work in the smelter. The doctor approved this request with the understanding that Lunsford "would have a lead check every two weeks, * * *." After returning to work in January 1960, urine samples were regularly taken during the time he worked that year. A union strike caused cessation of his work for seven and a half months. Samples were also taken January 24, and February 7, 1961,

the last sample being taken only three days prior to his death.

Claimant contends that doubtful workmen's compensation cases should be resolved in favor of the awarding of compensation. This is a recognized rule to be applied in construing the workmen's compensation law. Kiger v. Idaho Corporation, 85 Idaho 424, 380 P.2d 208; Smith v. University of Idaho, 67 Idaho 22, 170 P.2d 404. But this rule cannot be expanded in the area of the board's factual determinations supported by substantial, competent evidence. Idaho Const. Art. 5, § 9, states: "* * * On appeal from orders of the industrial accident board the court shall be limited to a review of questions of law. * * *" I.C. § 72–609, which establishes the appellate procedure from the board, provides:

"Upon hearing the court may affirm or set aside such order or award but may set it aside only upon the following grounds, and shall not set the same aside on any other or different grounds, to-wit:

"(a) That the findings of fact are not based on any substantial, competent evidence;

"*    *    *    *    *    *

"(d) That the findings of fact by the board do not as a matter of law support the order or award."

Claimant would have this court, in its examination of the record, apply the further rule that positive evidence is entitled to more weight than negative evidence. In this connection claimant argues that the testimony of her medical experts, to the effect that there was a causal connection between the decedent's lead poisoning and the coronary thrombosis which caused his death, should be entitled to more weight or credence than the testimony of the company's medical witnesses who stated there was no such connection. For this proposition claimant cites several authorities, including Beaver v. Morrison-Knudsen Company, 55 Idaho 275, 41 P.2d 605, 97 A.L.R. 1399, and Young v. Herrington, 61 Idaho 183, 99 P.2d 441.

In Beaver v. Morrison-Knudsen Company, supra, the following statement is to be found:

"Positive expert testimony will prevail over negative expert testimony. Womack v. New Orleans Public Service, Inc., 5 La.App. 71. The expert testimony on behalf of claimant was of a positive nature, respondents' of a negative, if it be conceded that there is negative testimony on the material issue, namely: Whether the breathing of silica dust rock by the claimant set up an irritation in his lungs and lighted up his tuberculosis."

This case was decided in February 1934. In 1935 the legislature adopted H.J.R. 1,

proposing an amendment to Idaho Const. Art. 5, § 9, as it then existed, by adding to such section the following sentence: "On appeal from orders of the industrial accident board the court shall be limited to a review of questions of law." This proposed amendment was ratified at the general election in November 1936. In 1937 the legislature, by Chap. 175, S.L.1937, amended I.C.A. § 43–1409 to its present wording, I.C. § 72–609.

Subsequent to Beaver v. Morrison-Knudsen Company, supra, this court in Young v. Herrington, supra, stated:

"Bearing in mind the rule that positive testimony is entitled to more weight than negative testimony * * * the only reasonable conclusion is that the accidental injury did contribute to Mr. Young's total disability and compensation should be awarded."

■■■ The rule that positive evidence is entitled to more weight than negative evidence may be employed as a guide by the finder of the facts in evaluating testimony in resolving factual issues, but it has no place in this court's appellate examination of a record in view of the constitutional and statutory limitations upon the scope of review. The weight to be given the testimony, the credibility of the witnesses and the reasonable conclusions and inferences to be derived from the record are peculiarly within the province of the board, and not of this court. Duerock v. Acarregui, 87 Idaho 24, 390 P.2d 55; Comish v. J. R. Simplot Fertilizer Company, 86 Idaho 79, 383 P.2d 333. This court's review of a record is solely for the purpose of determining questions of law, including whether there is substantial, competent evidence to sustain the findings of the board, and not to evaluate or settle conflicts in evidence or reasonable inferences to be drawn therefrom.

■■ Claimant next contends that she need not establish the cause of the compensable event to the exclusion of all the possible causes, citing, among others, Riley v. Boise City, 54 Idaho 335, 31 P.2d 968; Pierstorff v. Gray's Auto Shop, 58 Idaho 438, 74 P.2d 171. The company does not disagree with this assertion but counters it by pointing out that a compensation claimant has the burden of proving his case by a preponderance of the evidence. Harrison v. Lustra Corporation of America, 84 Idaho 320, 372 P.2d 397; Dawson v. Potlatch Forests, Inc., 82 Idaho 406, 353 P.2d 765; Darvell v. Wardner Industrial Union, 78 Idaho 309, 302 P.2d 950. If the board finds that a claimant has met his burden of proof of the compensable event, and if such finding is supported by substantial, competent evidence, the mere fact that there may be other possible causes of the compensable event will not defeat the claim.

Claimant's principal contention is that board's ruling of law:

"By a preponderance of the evidence herein claimant failed to prove that

the deceased, Leonard Lester Lunsford, at any time was afflicted with chronic lead poisoning; and failed to prove by a preponderance of the evidence that lead poisoning, either acute or chronic, in any degree, contributed to his death."

is not sustained by the evidence. Claimant's position in the premises is not to be construed as placing the burden of proof on the company but is directed to the principle that as a matter of law she did not sustain such burden. Claimant cites the cases of Whitaker v. National Smelting Co., Ltd., Court of Appeal, England and Wales, 33 W.C.C. 161; and Bethlehem-Sparrows Point Shipyard v. Bishop, 189 Md. 147, 55 A.2d 507 (1947).

In Whitaker v. National Smelting Co., Ltd., supra, the deceased in October 1929 had been certified by the proper authority as suffering from lead poisoning after having worked in lead production for a year. He had been awarded compensation for a period of half a year and returned to his employment. He again became ill and upon examination was certified by a medical referee as not afflicted with lead poisoning. In 1938 the employee was suddenly taken ill and died. A postmortem examination indicated death was caused by heart failure due to high blood pressure. A medical assessor, sitting with the court that heard the claim, determined the balance of probability to be that death was caused by the earlier lead poisoning. The court found that death was caused by lead poisoning and its sequelae. On appeal, the Court of Appeals of England and Wales reviewed the evidence and held that there was sufficient evidence to sustain the finding of the lower court.

The case of Bethlehem-Sparrows Point Shipyard v. Bishop, supra, was cited by claimant in refutation of the company's argument that the case of Whitaker v. National Smelting Co., Ltd., supra, was an early case and one which should no longer be considered as authoritative because lapse of time has changed the theories of the experts in this area. The Bishop case involved a claim for death benefits by a widow and infant under the Maryland occupational disease law. The issue as to the cause of death of the employee was referred to a medical board which found that decedent "did not die as the result of lead intoxication." Upon review the State Industrial Accident Commission reversed such finding of fact; whereupon the State Superior Court, upon appeal, affirmed the award of the commission. In disposing of a higher appeal, the Maryland Court of Appeals held that the Industrial Accident Commission had authority to review factual determinations of the medical board but that courts could not review the findings of the commission, beyond determining if the evidence was sufficient to support such findings. The court then held that substantial evidence

sustained the findings which required affirmance of the commission's award.

In the Whitaker and Bishop cases, supra, the appellate courts, after reviewing the findings of a board or commission comparable to the Industrial Accident Board of Idaho, held that there was substantial evidence to sustain the findings made.

Review in the case at bar must be based solely on the issue whether there is substantial, competent evidence to sustain the findings of the board. A brief review of the medical testimony, thus, is in order.

As previously mentioned, claimant's medical experts were: Dr. Myhre of Spokane, an internist; Dr. Ward of Boise, a general practitioner; and Dr. Beeman of Boise, a pathologist. Their testimony can be summarized as follows: Not having examined the deceased, their opinions were based upon an analysis of the deceased's medical history, which included the report of Dr. Whitesel concerning the hemoglobin examinations of the deceased, together with the report of the analysis of spot urine samples taken by the company. They testified that the maximum safe level of lead content in the urine is 100 micrograms per liter, that normally there should be no stipple cells in the blood and that a count of 100 stipple cells per million red cells indicates an abnormal condition, that the stipple cell count of the deceased and the lead level of his samples of urine indicated that he was suffering from chronic lead poisoning.

Dr. Myhre testified:

"I am testifying to the opinion of authorities that I know of and in my own experience. When we see lead in excess of 100 micrograms of urine we consider it pathological."

Dr. Beeman testified:

"Q Directing your attention, Doctor, to the fact that the lead level in Mr. Lunsford's urine, as disclosed by Exhibit 5, was 135 micrograms per liter on February 7, 1961, three days before his death, and was 174 micrograms on January 24th, approximately two weeks prior to his death, and taking into account that on February 7, 1961, as disclosed by Exhibit 4, the stipple cell count of Mr. Lunsford was 200 stipple cells per million cell count, what is your opinion as to whether or not Mr. Lunsford was suffering from lead intoxication at the time of his death?

"A It is a good probability, particularly in the light of the stipple cell count, since it is rather characteristic for the stipple cells to decrease, actually, as the chronic process proceeds so that with a sudden jump it would be a good likelihood that an acute episode was again beginning at this time, on the 7th."

Dr. Ward testified that on the basis of the figures to which Dr. Beeman testified, it was his opinion that the deceased was suffering

from lead intoxication at the time of his death. He stated on cross-examination:

"As an individual reading, Sir, 135 would not be dangerous, but you get the whole picture of a person who has had plumbism, and who has had an accumulation of other symptoms of lead poisoning, then 135 becomes a dangerous sign, but just arbitrarily taking 135 in one finding would not be considered dangerous, no."

All three of claimant's expert witnesses agreed that Lunsford had suffered an attack of lead poisoning during December 1959 and that he was suffering from lead intoxication at the time of his death. When asked for an opinion as to a relationship between Lunsford's history of lead poisoning and his death by coronary thrombosis, these witnesses testified:

Dr. Beeman:

"With the chronic plumbism as indicated in the urinary levels and the basophilic stippling and the red cells, the existence of the lead poisoning would be definitely contributory, whether directly as a result of an acute exacerbation of the lead poisoning, or by aggravating the premature arteriosclerotic process in his body affecting his coronary arteries."

Dr. Myhre:

"My opinion is that Chronic lead poisoning can produce spasm and

changes in the arterial bedding. It is well known and a matter of record that angina pectoris, coronary disease, cardionecropathy can be produced by ingestion of lead over a period of time. It is apparent that Mr. Lunsford had ingested lead—therefore, since lead can produce it, is is my opinion that in this instance in all probability the ingestion of the lead contributed to his death from coronary thrombosis."

Dr. Ward:

"A It is my opinion that the causal relation is that his death was caused by the lead poisoning, basically. He developed coronary thrombosis—however, what is back of the coronary thrombosis would have to be traced, physiologically, from the arteriosclerotic changes that lead poisoning will produce, and those arteriosclerotic changes in the coronary arteries, as well as in other arteries in the body, will produce angina pectoris, which is acute pain in the chest, from the heart, and this can go on to complete obstruction of your coronary artery, and if this is at a point on the coronary artery where enough circulation to the heart muscle is involved, death will occur as it did in this man, in about an hour and a half.

"Q Do you believe that is what occurred here?

"A  In my opinion, that it what happened here."

The company presented the testimony of two physicians practicing in Kellogg. They were Dr. Whitesel and Dr. Staley. Dr. Whitesel, who was Lunsford's family physician, attended Lunsford while he was in Idaho and had treated him for his attack of appendicitis and operation in October 1959. He diagnosed, hospitalized and treated Lunsford for acute plumbism in December 1959 and was the physician who certified to Lunsford's death in February 1961.

Dr. Whitesel testified at length as to the standards accepted by the mining industry for lead content in the urine and the stipple cells in the blood.

He testified that as to the stipple cell level that indicates a potential dangerous situation:

"The first—the level that we feel clinical plumbism can be a possibility starts at 500 stipple cells per one million cells counted."

He also testified:

"Q  Are you aware, Doctor, of the fact that numerous medical authorities state that arteriosclerosis can be caused by lead poisoning?

"A  I am cognizant of the fact that probably over a prolonged period of time it is a possibility. By that, I mean years.

"Q  Would you think or would you feel that a period of chronic lead poisoning extending over a year or two could produce arteriosclerotic changes?

"A  To my knowledge, I think it would take many more years than one or two.

"Q  It may be that other medical authorities will differ with you on that?

"A  Yes, Sir.

*    *    *    *    *    *

"Q  One other question, following the acute phase of lead poisoning and following the remission of the acute symptoms, may it still be that there is lead left in the body?

"A  I think if you have—theoretically, if you have a patient come in with acute lead poisoning, and he is treated, and you get his stipple cell count down to essentially normal levels—which I believe is 500 stipple cells, or lower, and if he is checked periodically and not found to have a stipple cell count of any significance, then I don't think there is any pathological process going on, is that what you wanted to know?

"Q  That is what I wanted to know. What pathological process is going on when the damage is taking place?

"A  During the acute intoxication?

"Q  Yes.

"A You are getting a deposition of your lead into the various organs we have talked about."

He further testified:

"Q Does your examination in that exhibit [Exhibit 4, showing blood tests and stipple count of deceased at various times] show that he ever suffered from lead poisoning?

"A After the original?

"Q Yes, Sir.

"A No, Sir.

"Q Does your exhibit show he was not suffering from lead poisoning two days before his death?

"A Yes, Sir."

Dr. Staley testified that he had been engaged in an active practice of medicine at Kellogg since February 1939 and had seen the records of probably a thousand individuals who had been exposed to lead. He stated:

"We report and classify as plumbism all cases who have had an exposure and have absorbed lead beyond a certain standard. Now all of those cases are not acutely intoxicated, they are not lead poisoning cases, as such. I imagine that I have probably seen 500 cases that have absorbed more than the amount of lead that we consider healthful, and I have probably seen 40 cases of acute intoxication."

Dr. Staley was asked a hypothetical question dealing with Lunsford's medical history and the exhibits admitted into evidence and as to whether Lunsford was suffering from plumbism after he was released from the hospital to return to work in 1960. He stated that in his opinion Lunsford was not intoxicated and that he evidenced no intoxication by lead. He also expressed his opinions Lunsford was not intoxicated by lead during the period from December 28, 1960, to February 10, 1961; that during the seven and a half month period of the union strike, Lunsford would have excreted all the lead from his system. He testified:

"A There is no sequelae to lead intoxication, with one exception, and that is the exception of damage to nerve tissues, so-called lead encephalopathies, which I think are rare—to extinction.
* * *

* * * * * *

"Q Do you have an opinion, Doctor, after reading the record as to whether or not the exposure to lead by the deceased, Leonard Lunsford, could be attributed to his death by coronary thrombosis?

"A I have an opinion.

"Q What is it?

"A That it did not contribute to arteriosclerosis or coronary sclerosis.

"Q What is the effect, with reference to permanent damage to the heart and the vascular system, by the fact that a person has been exposed to lead?

"A Modern day authorities feel that there is nothing to substantiate the fact that acute lead intoxication in any way affects the vascular system."

On cross-examination Dr. Staley further testified:

"Q * * * If it were true, Doctor, that anything above 100 stipple cells, and anything above 100 micrograms of lead per liter indicates lead intoxication, we would have to agree, wouldn't we, that Mr. Lunsford was suffering from a chronic condition of lead intoxication throughout most of the year preceding his death?

* * * * * *

"A I would say no—very definitely no.

* * * * * *

"Q That would be so in your view, Doctor, even if you agreed with the other medical authorities of America, that anything in excess of 100 micrograms of lead per liter of urine and 100 stipple cells indicated a dangerous level of lead ingestion?

"A Mr. Greenfield, you can't get anything chronic in a year. You are stating chronic poisoning, and I am denying it.

"Q If a man has a dangerous level of lead in his system for a year, would you call that kind of a prolonged acute attack?

"A He might be sub-acute, but you can't be chronic in a period of a year.

"Q Whether we call it chronic or sub-acute, there certainly can be organic damage taking place all that time, can't there?

"A There is no fact to substantiate that.

"Q There are many medical texts that say so, are there not?

"A I don't think modern texts—no."

Where the determination of the cause of decedent's death is dependent upon the opinions of the medical experts called by the respective parties, the opinions of such witnesses founded and based upon facts and recognized medical theories constitutes competent evidence upon which the board may make its findings and upon which to base its ultimate conclusions. Oliver v. Potlatch Forests, 73 Idaho 45, 245 P.2d 775; Walker v. Hogue, 67 Idaho 484, 185 P.2d 708; Cameron v. Bradley Mining Co., 66 Idaho 409, 160 P.2d 461. Such findings, when supported by substantial, competent evidence, cannot be set aside by this court. Flasche v. Bunker Hill Company, 83 Idaho 420, 363 P.2d 1024; Davis v. Sunshine Mining Co., 73 Idaho 94, 245 P.2d 822; Shumaker v. Hunter Lease & Gold Hunter Mines, 72 Idaho 173, 238 P.2d 425; Adams v. Bitco, Inc., 72 Idaho 178, 238 P.2d 428; Stralovich v. Sunshine Mining Co., 68 Idaho 524, 201

P.2d 106; Frazier v. National Bearing Division, 250 S.W.2d 1008 (Mo.1952).

It is the conclusion of this court that the findings of the board are sustained by substantial and competent evidence and that the ruling of the board that claimant failed to sustain the burden of proof that lead poisoning contributed to the decedent's death must be upheld. Order of the board affirmed. Costs to respondent.

McQUADE, C. J., and TAYLOR, SMITH and KNUDSON, JJ, concur.