430 P.2d 497

Eugene **DIFFENDAFFER**, Claimant-Respondent,

v.

Thomas C. **CLIFTON**, James L. Lafferty, and Truck Insurance Exchange, Defendants-Appellants.

No. 10007.

Supreme Court of Idaho.

July 19, 1967.

Elam, Burke, Jeppesen & Evans, Boise, for appellants.

Coughlan & Imhoff, Boise, for respondent.

McQUADE, Justice.

Respondent was permanently totally disabled when an automobile, in which he was a passenger, went out of control while traveling on a national forest development road and tumbled down an embankment. Respondent was then en route to a site where an association composed of his employers, appellants Thomas Clifton and James L. Lafferty, were engaged in tree-planting under contract with the federal government.

Respondent, claiming that he was entitled to workmen's compensation because of the accident and resulting disability, instituted the present proceeding before the Industrial Accident Board against appellants Clifton and Lafferty and their surety, appellant Truck Insurance Exchange. After a hearing, the Board found that "the accident and resulting injury arose out of and in the course of his [respondent's] employment" with appellants' association. This finding and conclusion was based on a more specific finding that although the accident which caused respondent's disability occurred off the premises of his employers while he was going to work, nevertheless "The risk or hazard of the travel [during which the accident happened] * * * were [sic] exposures occasioned by the nature of claimant's [respondent's] employment" with appellants' association. On its findings, the Board entered an award granting respondent compensation for his disability. This is an appeal from that award.

Appellants have restricted their arguments on this appeal to a contention that the Board erred by finding the automobile accident of present concern arose out of and in the course of respondent's employment with appellants' association. The facts necessary for consideration of this contention are detailed hereinafter.

On the day of the accident, respondent, then a sixteen-year-old high school student, and John Cook, a fifteen-year-old student, left their homes in Boise, Idaho, about 5:00 a. m., and with Cook driving proceeded to Idaho City, Idaho. Respondent and Cook were part of a group of high school and college students whom appellants' association then hired on weekends (since schools were still in session) to plant trees in the Lowman ranger district of the Boise National Forest, northwesterly of Idaho City. At six o'clock that morning, respondent and Cook had rendezvoused at the Vigilante Cafe in Idaho City with some foremen and other employees of appellants' association. Concerning the purpose of this rendezvous, the Board found:

"Because of the remoteness of the area and the Employer's experience with losing employees on the way to the remote planting site, the weekend employees, as Claimant, were directed to meet in Idaho City. There, the Employer's [sic] foremen would meet the employees, assemble them, get their cars into line and lead the car caravan to the work site."

The testimony conflicts regarding whether the weekend employees "were directed to meet in Idaho City," or merely informed that some of the foremen would be there as a convenience to the employees. Appellant Clifton testified that it was permissive with each employee whether he would meet the foremen at Idaho City. His pertinent testimony is as follows:

"Q Mr. Clifton, is it not true that these boys were directed when they were hired to meet or to assemble at a specified point, that point being the

Vigilante Cafe generally in Idaho City?

"A  They were told that they could meet there as a matter of convenience and that our Saturday foremen were going in and they would—one went ahead and one went behind—one would go ahead and one would go behind or just one would go ahead but he would lead them into the area. The reason we decided to do that, it, like I say, was a convenience to them, but we have had fellows just strewn all over the country. We have sent any number of men out and they have never reached the planting area. It's just difficult to direct them. We would have flags and colored ribbons hanging on the trees and what not to direct them in their, but still a lot of them wouldn't get there.

\*   \*   \*   \*   \*   \*

"Q  You didn't pay them any mileage?

"A  No, we did not.

"Q  Or arrange for transportation. But you said, 'You be there however you can get there; you get your own transportation and be there at this time and place?'

"A  Right. Some went in Friday night and stayed at our campsite; others selected to go up early Saturday morning. But they were to report to work to our general camp there.

"Q  But now at this Vigilante Cafe, you testified that you would lead them in. You mean you would caravan the cars; get them in line and lead them in, one foreman lead them and one bring up the rear?

"A  Well, that's the way that it worked out, that the foremen were going in and they said, 'Well, fellas, stay behind us or stay ahead of us and we'll see that you get to our base camp.'"

Clifton also said, however, that the caravan system served his convenience and admitted that his "foremen were there basically to assemble these boys, get them into the line and get them up to the worksite."

The testimony of several witnesses suggests that the rendezvous was in response to an express or implied direction by appellants Clifton or Lafferty or their foremen. Fred Frahm, an eighteen-year-old college student who was a weekend employee of appellants' association, testified that on the weekend before the accident, appellant Lafferty and a foreman had "told me to go on up to Idaho City, to meet at the cafe there," and on the day of the accident, Frahm met the other employees at the cafe under "sort of a general understanding that we were supposed to go up in a group." John Cook, respondent's driver, testified:

"The week before [the accident] after we finished on the job, the [an appellants' association's] foreman told us that we wouldn't be coming to the same area so we'd have to meet at the [sic] Idaho City and then they'd take us up to the new site."

Dennis Vogt, a twenty-year old Boise College student and weekend employee of the association, testified that the weekend before the accident, "they [appellants' association's foremen] told us to go on up to the Vigilante Cafe," and that on the day of the accident, "we just surmised that we should go up there [the cafe] and wait for them [the foremen]." The testimony of Harold Eshelman, one of the association's foremen, contains the following:

"A  \*  \*  \*  we did talk about gassing up at Idaho City of that particular morning and, thus, we would naturally meet there.

\*   \*   \*   \*   \*   \*

"A  Everyone knew that we were going up that morning.

"Q  And that you would stop at the Vigilante Cafe?

"A  Yes."

Respondent himself testified that appellant Lafferty had "said to meet at the Vigilante Cafe in Idaho City" the weekend before the accident, and the foreman on that weekend "told us where to meet for the next

week-end [that of the accident]. Said [sic] the group would meet there [Vigilante Cafe in Idaho City] the next weekend."

Besides the direct testimony presented immediately above, the record contains corroborative evidence supporting the Board's finding that respondent and his fellow employees were directed on behalf of appellants' association to rendezvous at Idaho City and from there to caravan into the planting-site. At the Vigilante Cafe, appellants' association's foremen sometimes explained the job to the employees and the latter sometimes signed their contracts. As the Board found, the route into the base camp was not marked with ribbons on the day of the accident, from which it might be inferred that the caravan system had superseded the association's earlier reliance on ribbons to mark the route in an effort to assure that employees would reach the planting-site. Appellant Clifton's testimony as quoted above supports such an inference. It should be noted too that respondent and his driver, Cook had been to the planting-site only once, on the previous weekend, and the appellants-employers themselves generally did not know the exact planting-sites for any given day until the forest service had decided the evening before.

Appellants' association paid respondent and the other weekend employees on a piecework basis, by the number of trees planted, and did not provide transportation nor reimburse them for travel expenses to and from work. However, the association made a travel expense bookkeeping adjustment to each employee's payroll voucher by listing thirty per cent of his gross pay as "Travel" and so entering only seventy per cent as "Adjusted Gross Wages." Thus, if an employee earned $100.00 after normal deductions by planting the requisite number of trees he would receive $100.00 in his paycheck, but on the association's records for tax purposes $30.00 of his net pay would be listed as "Travel." Each employee, regardless of whether he himself drove to work, was a passenger in another's car, or camped at the planting-site, received the same deduction for travel. The Board recognized that this adjustment was primarily a device used to lessen the employee's taxes, but the Board also stated that the federal Internal Revenue Code permits travel expense deduction only when incurred "in the course of employment."[1] Viewed in this perspective, the Board found, the adjustment "is an indication that the Employer treated the travel expense as an item to be reimbursed to his employees; and an indicium that the travel was 'in the course of employment.'"

The principal purpose of the rendezvous at Idaho City was to enable appellants' association's employees and foremen to put their vehicles in line and travel into the planting-site in convoy formation. Concerning the first or lead vehicle, the Board found the weekend employees had been informed on behalf of appellants' association that a "foreman would lead them into the [planting] area," and that on the day of the accident, after assembly at Idaho City, the employees "were told to 'follow the line' and they lined up in a caravan with a foreman in front and another behind."

1. For clarity, it should be mentioned that the federal Internal Revenue Act of 1954 itself does not use the phrase "course of employment" in its pertinent provision. The act permits deductions from gross income of "expenses of transportation paid or incurred by the taxpayer in connection with the performance by him of services as an employee," by an individual not engaged in his own trade or business. Fed.Int.Rev.Code of 1954, § 62(2) (C), 26 U.S.C. § 62(2) (C) (1965). See also Fed.Int.Rev.Code of 1954, § 162 (a) (2), 26 U.S.C. § 162(a) (2) (1965). The federal Internal Revene Service uses the phrase "in the course of his [an employee-taxpayer's] employment," in its regulation concerning business transportation expenses of an employee-taxpayer for which he has not been reimbursed. 26 C.F.R. 1.62(1) (g) (1967). However, it is obvious from the Board's findings, and from our discussion in the text at this footnote, that any mistake in this regard was only technical. See Idaho R.Civ.P., § 61.

Appellants contest the finding that a foreman led the caravan on the accident day, but although there is direct evidence supporting this finding, there is none to deny it. Appellant Clifton testified that customarily "one [Saturday foreman] would go ahead and one would go behind or just one would go ahead and he would lead them [the employees] into the area." Respondent did not know specifically who led on the day of the accident, but his driver, John Cook, testified, "I am not sure but I think it was [appellant] Lafferty who was [leading the caravan]." Mort Mighell, a foreman, testified that Arno Chapman, another foreman, was in a car ahead of respondent. There is no evidence that someone other than Lafferty or a foreman led the convoy.

Approximately seven vehicles were in the caravan on the day of the accident, the Board found, and the auto in which respondent and Cook were driving was apparently fourth or fifth in line.

On the day of the accident, the only available route for the caravan from Idaho City to the planting-site was the Rabbit Creek Road. The road had a surface of dirt-gravel or "decomposed-granite," and a two-car width and turnouts. The forest service classified it as a forest development road, and the Board described it as a "winding, forest logging and recreation road." The base camp for appellants' association's planting-sites was about twenty-four miles northwesterly from Idaho City and the accident occurred at a point slightly beyond midway.

Much of the testimony at the Board hearing concerned the amount of dust through which the caravan had to travel and its effect on visibility. In this regard, the Board found,

"As was well known to the Employer, this road was narrow, winding and dusty * * * and the caravaning of approximately seven vehicles caused a greater amount of dust than if only used by the public generally."

Supporting this finding is the testimony of several witnesses. Mort Mighell testified that there was "quite a bit of dust." Dennis Vogt said,

"Dust conditions were terrible, because all the cars in front of you each one would pick up so much dust and then further back in the line you got the worse the dust got."

Vogt also testified that most of the time he was unable to see the car ahead but for its taillights due to the dust, that he would sometimes "come into [a curve] before you knew you were actually going around a curve," and that he became aware of the accident by the "absence of dust" in front of him. He estimated a "two-block" distance of dust on the road. John Cook, respondent's driver, testified that because of "the dust condition of the road" he "couldn't see very far ahead. * * * Sometimes all I could see was the flashing of the taillights in front * * * because of the dust * * *."

On the other hand, Fred Frahm, a weekend employee, testified that the dust would not hinder a front view unless a driver was "within a couple [of] car lengths" from the automobile ahead. It seems, however, that Frahm was not driving and was dozing on and off during the trip. A foreman of appellants' association, Harold Eshelman, "didn't notice any dust from the cars in front of us, but they were quite a ways ahead of us [more than one mile]."

With respect to the immediate circumstances of the accident, the Board quoted in its findings testimony of John Cook, respondent's driver, in which the following appears:

"Q  Would you please tell us how the accident did occur?

"A  Well, I was coming around a corner and then I guess I just hit—the corner was longer because I held on to the steering wheel too long and then when I realized I was coming up into the mountain, I swung the steering wheel around back, I guess too fast, because I headed off

the side of the road and the back tire caught and I guess we slid off."

Dennis Vogt, driver of the car behind respondent's, described the curve as "kind of a short corner that cut right back in; it headed towards the river and cut right back in." Regarding visibility on the curve, Vogt testified, "As we came around the corner, we were discussing how dusty it was * * *." Respondent's driver couldn't remember if he clearly saw the curve. The distance of respondent's car from the vehicle ahead is not shown, but Vogt observed in his testimony that "the car ahead never did see the accident so they [the two cars] couldn't have been too close."

■ Consideration of the record leads to the conclusion that each of the Board's findings of fact heretofore discussed is based on substantial, competent evidence and will not be disturbed. I.C. § 72–609(a); Bennett v. Bunker Hill Co., 88 Idaho 300, 399 P.2d 270 (1965); Cf. Idaho Const., art. 5, § 9; I.C. § 72–608.

Based on the evidence and findings summarized above, the Board made ultimate findings as follows:

"The risk or hazard of the travel from Idaho City to the planting site, compounded in a car caravan conducted and lead by the Employer, were exposures occasioned by the nature of the Claimant's employment. The Employer exercised considerable control over the employee's travel from the time of their departure from Idaho City.

"The evidence establishes that the Claimant's accident arose out of and was a necessary risk associated with his employment and the conditions, obligations and incidents of that employment. The Board finds and rules that the accident and resulting injury arose out of and in the course of his employment."

■ An employee's injury from an accident which occurs while he is driving to work in an automobile which has not been provided by his employer is generally presumed not compensable as not "arising out of and in the course of [his] employment," within the meaning of I.C. § 72–201; South v. Bonner County School District No. 82, 91 Idaho 786, 430 P.2d 677, July 20, 1967; In Re Croxen, 69 Idaho 391, 207 P.2d 537 (1949); see 1 Larson, Workmen's Compensation § 15.11 (1966); 8 Schneider, Workmen's Compensation Text § 1710 (3d or perm.ed.1951). If, however, the nature of an employment has subjected a worker to a "peculiar risk," it is deemed to have arisen out of and in the course of employment and so becomes compensable. Jaynes v. Potlatch Forests, Inc., 75 Idaho 297, 271 P.2d 1016, 50 A.L.R.2d 356 (1954); see 1 Larson, Workmen's Compensation § 15.13 (1966); 8 Schneider, Workmen's Compensation Text, § 1712(b) (3d or perm.ed.1951).

This Court first recognized and applied the peculiar risk doctrine in Jaynes v. Potlatch Forests, Inc., supra. In *Jaynes,* an employee, just after leaving his employer's "plant" through its main gate, was struck by a train at an adjacent railroad crossing. The "plant's" main gate, its almost exclusive means of access, had a common boundary with the crossing, and the employee had proceeded through the gate and directly across the tracks to the point where he was hit, less than fifty feet from his employer's property. Reversing a Board order which had denied compensation on grounds that the accident and resultant injuries had not arisen out of and in the course of employment, this Court said:

"A substantial and fair ground to justify the extension of the course of employment beyond the premises of the employer is to extend its scope to the necessary risks and hazards associated with the employment.

\* \* \* \* \* \*

'* * * such extension is justified beyond the premises in order that it may embrace of necessity off-premises conditions that are worthy to be designated as risks of such employment and as such compensable." Id. at 303, 271 P.2d at 1019.

The opinion speaks of "predicat[ing] liability on the ground of a special exposure to hazard or risk," id. at 301, 271 P.2d at 1018, and permitting recovery for an accident which occurs "within range of dangers peculiarly associated with the employment." Ibid.

It may be argued that its facts limit severely the import of the *Jaynes* case, even restricting it to a "railroad crossing" or adjacent pathway situation, and indeed appellants have argued that *Jaynes* is completely distinguishable from the facts presented by this proceeding. However, although the Court in Jaynes pointed out that the peculiar risk doctrine was "intended to cover * * * only instances where there is a very real and special danger—to reach out and cover that danger; * * * as in this instance, a hazardous railroad crossing," id. at 303, 271 P.2d at 1019, the *Jaynes* opinion also describes the doctrine as,

> "a recognition of the causal connection between the conditions under which an employee must approach and leave the premises of the employer and the occurrence of the injury; it recognizes that the employment involves peculiar and abnormal exposure to a common peril which annexes itself as a risk incident to and inseparable from the employment; it is not necessarily based upon nearness to the plant nor upon reasonable distance therefrom or even identifying the surrounding area as an integral part of the premises for all practical purposes but upon a causal relationship between the work and the hazard." Id. at 302, 271 P.2d at 1018.

See 1 Larson, Workmen's Compensation § 15.13, at 202–203 (1966); cf. id., §§ 15.15 and 29.10; see also Hansen v. Superior Products Co., 65 Idaho 457, 146 P.2d 335 (1944); Logue v. Independent School Dist. No. 33, 53 Idaho 44, 21 P.2d 534 (1933); Anderson v. Woesner, 66 Idaho 441, 159 P.2d 899 (1944).

In Dutson v. Idaho Power Co., 57 Idaho 386, 65 P.2d 720 (1937), this Court affirmed a workmen's compensation award based on an accident analogous to the present one. In *Dutson,* claimant, on his way to begin his day's work, was injured in an automobile accident on the only road leading to the employer's construction camp in the Snake River Canyon. Although the road had been "built, owned and maintained by his employer" and "had not been dedicated as a public road," it "was used alike by the employer, employee and members of the public having occasion to travel to and from the construction work". Id. at 338, 65 P.2d at 721.

*Dutson* might be distinguished from the present case on the ground that the injury there occurred on a private road while the accident of concern in the present proceeding happened on a public road. That distinction was weakened in this jurisdiction, however, by Jaynes v. Potlatch Forests, Inc., supra, in which, it will be recalled, the accident occurred on a public railroad crossing. The *Jaynes* Court said,

> "The extension of the course of employment to off-premises injuries is not based upon the principle which would justify a distinction upon the narrow ground of private and public property; it is not sound to say that while an employee is on a public highway he is always there as a member of the public and in nowise in the exercise of any right conferred by his contract of employment; nor is it a complete answer to say that while he is on his employer's premises his presence there is by contract right, otherwise he would be a trespasser." Jaynes v. Potlatch Forests, Inc., supra at 302, 271 P.2d at 1019.

Rather, the Court said, the test should be, "the necessary risks and hazards associated with the employment." Ibid. See also Skeen v. Sunshine Mining Co., 60 Idaho 741, 96 P.2d 497 (1939).

Appellants object to the Board's finding that the association's bookkeeping adjustment for travel expense was "an indicium that the travel was 'in the course' of employment." As discussed above, the

adjustment was made for each employee regardless whether he incurred actual expenses in traveling to and from work, and therefore this bookkeeping device is not strong evidence that the travel to work was part of the employment. See generally 1 Larson, Workmen's Compensation § 16.30 (1966); 8 Schneider, Workmen's Compensation Text § 1744 (3d or perm.ed.1951). Nevertheless, the discussion of this device in the Board's findings clearly show that the Board understood the transaction and knew that it should not be controlling but merely be some evidence that respondent's trip to work was in the course of his employment. Full consideration of the Board's findings leaves no doubt that the travel expense adjustment was given little weight, and so any error in this regard would be harmless. Idaho R.Civ.P., 61; Parks v. Parks, 91 Idaho 420, 422 P.2d 618 (1967).

The pertinent facts presented by the present proceeding may be summarized for convenience as follows: On a "remote" tree-planting enterprise in the Boise National Forest, an employer has experienced difficulty in assuring that his weekend employees find the base camp which is located some twenty-four miles northwesterly of Idaho City. These weekend employees are paid on a piecework basis, per tree planted, but, nevertheless, so that they will not become lost on their way to his planting-site, the employer directs them to assemble at a common place, the Vigilante Cafe in Idaho City.

One of the employer's foremen leads the convoy out of Idaho City towards the base camp. Midway, the fourth or fifth vehicle in this caravan line, in which rode the present claimant, driven by a fifteen-year-old high school student whom the employer had also previously hired as a tree-planter, is forced to travel at an imprudent speed in order "to keep up with the lead car," the "speed of travel" being "controlled" by the employer (through his foreman in the lead). The only feasible route, as the employer knows, is a "narrow, winding and dusty" forest development road "and the caravaning of seven vehicles [on the day of concern] caused a greater amount of dust than if [the road were] only used by the public generally." Rounding a hairpin turn, "a short corner that cut right back in," the accident vehicle went out of control and tumbled down an embankment, causing claimant's disability.

■■ Considering that it is within the province of the Industrial Accident Board to determine credibility of witnesses, weight to be assigned their testimony, and the reasonable inferences to be drawn from the record as a whole, Bennett v. Bunker Hill Co., 88 Idaho 300, 399 P.2d 270 (1965); cf. Idaho Const., art. 5, § 9; I.C. §§ 72-608 and 72-609, the evidence in the present proceeding sufficiently supports the Board's findings that the nature of respondent's employment with appellants' association subjected him to a peculiar risk which resulted in his disability.

Award affirmed. Costs to respondent.

TAYLOR, C. J., and SMITH, McFADDEN, and SPEAR, JJ., concur.