446 P.2d 628

Sarah Ann ALDER, DeLaine Archibald, Mary A. Barnes, Donna P. Bowen, Louaine Hadfield, Edna H. Harris, and Myrl Willie, Claimants-Appellants,

v.

MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY and Department of Employment, Defendants-Respondents.

No. 10073.

Supreme Court of Idaho.

Nov. 1, 1968.

E. L. Scott, Malad, Jones, Pomeroy & Jones, Pocatello, for appellant.

Carl F. Eiberger, Denver, Colo., Carey H. Nixon, Boise, for respondent Mountain States Telephone and Telegraph Company.

Robert C. Youngstrom, Boise, for Department of Employment.

McQUADE, Justice.

This appeal is from a decision of the Industrial Accident Board which affirmed a decision of the chief appeals examiner for the Department of Employment, denying appellants' claims for unemployment benefits under Idaho Employment Security Law. The only question involved is whether appellants are ineligible for benefits because their unemployment is due to the fact that they were "discharged for misconduct in connection with [their] employment" under I.C. § 72–1366(f).

Sarah Ann Alder, DeLaine Archibald, Mary A. Barnes, Donna P. Bowen, Louaine Hadfield, Edna H. Harris, and Myrl Willie, appellants, were employed by Mountain States Telephone and Telegraph Company (hereafter referred to as Mountain States) as telephone operators at the Malad Exchange in Malad, Idaho. At the time the events in this case occurred, the Malad Exchange was not yet automated. It was therefore the duty of these operators manually to place local and long distance telephone calls for the subscribers of Mountain States. The issue in this case concerns only the placing of long distance calls. The procedure normally followed by an operator in placing long distance calls was to record certain information about the call on a ticket: the name and number of the person placing the call, the location and number of the party called, and the times at which the call began and ended. The ticket containing this information was required for every long distance call so that the proper person could be billed according to the distance and duration of the call, and the ticket would be sent to the accounting department of Mountain States for that purpose.

There developed at the Malad Exchange a practice of the operator on duty omitting to make these tickets when the party placing a long distance call happened to be a person employed as an operator. This practice was apparently of long standing and one which each newly hired operator eventually learned and finally took for granted as an "operator's privilege." Generally speaking, an operator after working hours and from her home would call one of the operators on duty and ask whether a circuit was open. This would be taken by the operator on duty as a request by the caller, who would be recognized by voice or otherwise, that a long distance call be placed without the preparation of a ticket. Thus, the off-duty operator would know that the call would be placed free of charge. This type of unticketed call would be placed mainly, if not exclusively, at night, when the chief operator at the Ex-

change was away from work. At night the only supervision was by an evening supervisor who was in fact an ordinary operator put in charge because of greater seniority.

■ The discrimination between operator-employees and the general, rate-paying public which resulted from this practice is prohibited by federal and state laws and regulations regarding public utilities. The policy of Mountain States had long been to prohibit the free call practices of its employees. Newly hired operators were told to make tickets on all calls, but whether through inertia or lack of detection, or both, the so-called "operator's privilege" of free calls continued.

In 1957, Mountain States issued a small pamphlet called the "Gray Book" (after its color) which set out the general rules and regulations of the company in ordinary language. Each currently employed operator was given a copy of the Gray Book and told to read it, as was each newly employed operator. Each of the appellants in this case was given a copy of the Gray Book for which each gave back a receipt acknowledging she had read it and understood it. Rules 9 and 10 of the Gray Book provide as follows:

> "9. Operators are required to make a ticket on every toll call handled and are prohibited from mutilating or destroying a ticket under any condition. * * *

> "10. All employees' personal toll calls must be properly recorded for billing. Employees shall not make personal toll calls for themselves or others from switchroom, switchboard or testboard facilities or any other facility from which a call would bypass the normal recording processes."

These rules plainly prohibit what each operator had taken for granted for years. Appellants in this case all acknowledged that they always understood the general import of rules 9 and 10 of the Gray Book, although they denied remembering its specific

terms. The concluding statement of the Gray Book was as follows:

> "[These rules and regulations] may not be waived in any respect and any willful violation may be cause of disciplinary action including dismissal. Any willful acts of dishonesty whether they involve misappropriation of Company funds or Company property, or deliberate distortion of reports, will be sufficient cause for dismissal."

Sometime prior to May, 1965, security personnel for Mountain States detected an unusual number of lengthy toll calls originating from the Malad Exchange which were not ticketed for proper billing. An investigation ensued in which the seven appellants admitted placing unticketed long distance calls for themselves and others. Appellants Barnes, Harris and Alder, when given opportunity to change their statements, temporarily denied making unticketed calls, but then appellants Alder and Harris admitted making such calls. At the hearing before the appeals examiner, all appellants except Barnes admitted making unticketed calls and stated that all the operators had done so, including appellant Barnes. For these admissions, appellants were dismissed from their employment with Mountain States on or before May 7, 1965.

Thereupon appellants filed claims for unemployments benefits with the Employment Security Agency, which were denied. Appeals were had pursuant to law to the Department of Employment appeals examiner and to the Industrial Accident Board where appellants were found ineligible for unemployment benefits because each was discharged for misconduct in connection with her employment. Appellants have

appealed to this Court pursuant to I.C. § 72–1368(i).

Appellants have made fourteen assignments of error. Ten of these assignments of error deal with asserted erroneous findings of fact, while the remaining four are asserted errors of law. We shall first discuss asserted erroneous findings of fact. It should be noted that I.C. § 72–1368(i) provides that on appeals to the Supreme Court "the jurisdiction of the court shall be limited to a review of questions of law." Therefore, findings of fact by the Industrial Accident Board cannot be reviewed unless the evidence supporting them is so insubstantial as to be erroneous as a matter of law. Stated positively, findings by the Industrial Accident Board will be upheld where they are supported by substantial and competent evidence.[1] A careful review of the record in this case disclosed no instance in which the findings of the Industrial Accident Board were so unsupported by evidence as to be erroneous as a matter of law.

The critical finding by the Board was that Mountain States did not have such knowledge of the operators' practice of making unticketed calls that the company must be taken to have permitted, tolerated or condoned the practice. The management official in closest contact with the operators was Viora Morgan, the chief operator, who worked only during the day when the operators, by their own testimony, refrained from making unticketed calls. The Industrial Accident Board carefully collected all the statements bearing upon the chief operator's knowledge of this practice and found it was insufficient to conclude she knew the "operator's privilege" was being vigorously exploited.[2] Appellants urge that

---

1. Idaho Const. art. 5, § 9; I.C. § 72–609 (a) and (d); Dawson v. Hartwick, 91 Idaho 561, 569, 428 P.2d 480, 488 (1967); Bradshaw v. Bench Sewer District, 90 Idaho 557, 564, 414 P.2d 661, 665 (1966); Bennett v. Bunker Hill Company, 88 Idaho 300, 306, 399 P.2d 270, 272 (1965); Czarlinsky v. Employment Security Agency, 87 Idaho 65, 69, 390 P.2d 822, 824 (1964); Ramsey v. Employment Security

Agency, 85 Idaho 395, 402, 379 P.2d 797, 802 (1963); Skeen v. Sunshine Mining Co., 60 Idaho 741, 748, 96 P.2d 497, 499 (1939).

2. Appellant Alder said she had "[n]ever seen Viora make an unticketed long distance call;" appellant Hadfield testified that the free calls were placed at night because Viora Morgan was not there;

the evening supervisors knew of the practice and therefore that this shows the company tolerated the practice. However, the evening supervisors were not management officials but only other operators with greater seniority. Knowledge on their part would not show Mountain States condoned the practice. Appellants also urge that the knowledge of the practice held by the security officers of Mountain States is enough to show the company condoned the practice. This argument is transparent not only for the reason that it would in effect nullify any policing efforts by the company necessarily based upon some knowledge of wrongdoing by employees but also because general suspicions or inferences that the practice must be "going on somewhere" are not such knowledge as would require anyone to conclude the company condoned the practice. We find that the conclusion of the Board that Mountain States did not condone the practice is amply supported by competent evidence.

The finding that substantial injury was done by the operators in making their free calls over the years is also substantially supported by the record.[3]

Appellants argue that Mountain States had an ulterior motive for discharging these operators for misconduct. It was alleged that in view of the projected conversion to automatic dial apparatus at Malad, it was less expensive and therefore more convenient to discharge employees for misconduct than to wait until the institution of dial phones when the operators would have to be laid off for lack of work and given unemployment benefits. The premise of this argument, as supposed economic saving to the company, becomes fanciful and evaporates in the light of the very economic factors which are said to support it. The total termination benefits for all of appellants would have been $4,916.00. This is the amount said to have been saved. Yet prior to any investigation or dismissal, the company had already budgeted this amount for the operators' termination benefits. The countervailing costs to Mountain States included direct costs of about $1,700 resulting from the investigation and dismissal of appellants. Mountain States was also required to hire and train new union-member employees to take appellants' places until the conversion to dial. Because of the discharge of appellants, the conversion to dial at Malad was advanced and an extra premium paid to the manufacturer of the necessary equipment. The cost of conversion was some $250,000. Moreover, termination benefits had been paid to operators after all other conversions to dial in Idaho. The finding of no ulterior motive for the discharges is substantially supported by evidence. Under the authorities cited, these findings are therefore binding upon this Court.

Turning to assigned errors of law, the first is that the Board erred in finding that appellants were discharged for "misconduct" as that term is used in I.C. § 72–1366 (f). The public policy of Idaho with respect to employment security and unemployment benefits is declared in I.C. § 72–1302 (a) which provides in part that "unemployment reserves [are] to be used for the benefits of persons unemployed through no fault of their own." To carry out this aspect of the declared public policy, I.C. § 72–1366 sets out the personal eligibility requirements for the receipt of benefits under the law, one of which is that the person's unemployment not be due to his discharge

---

appellant Archibald testified that since she as a janitor knew it, Morgan also must have; appellant Bowen said she "[could not] honestly say * * * whether Miss Morgan knew" but supposed she did because it was a small exchange.

3. Appellant Alder admitted making as many as 108 long distance calls for herself in addition to making calls for others;

appellant Hadfield admitted making about two or three toll calls a month for eleven and a half years; appellant Harris made about 108 free toll calls over three years; appellant Willie made as many as fifty calls over two years; appellant Archibald made about ten free calls during her employment as operator; appellant Bowen made twenty calls for herself and more for others.

for "misconduct in connection with his employment."[4]

Various cases decided by this Court have defined the term misconduct. Its abstract meaning has been defined as " * * * willful, intentional disregard of the employer's interest; a deliberate violation of the employer's rules; or a disregard of standards of behavior which the employer has a right to expect of his employees."[5] As applied in actual cases, the following actions have been held to be misconduct: refusing to work on a legal holiday;[6] talking back to the employer and general sloppiness in work habits;[7] one week's unexplained absence from work;[8] one day's unexplained absence from work;[9] failure to remain on twenty-four hour call;[10] throwing a piece of heavy metal into a scrap barrel whose contents were put into a shredder not intended for the disposal of metal;[11] off-duty moral turpitude.[12] The misconduct in each of these cases led to a discharge of the employee.

■ In the present case, the conduct of appellants as operators in the Malad Exchange was more seriously and persistently in disregard of their employer's interest than other cases mentioned. But for the failure to make tickets on every call, the misconduct was indistinguishable from normal operations. It was a matter of ease to make free calls, but it was for that reason no less misconduct. All of appellants knew the basic rule: make a ticket on every long-distance call, including your own. They violated that rule throughout their service, and we cannot but conclude it was misconduct for the purposes of ineligibility for unemployment benefits.

■ Appellants press the further argument that if Mountain States, through its agents, knew of the practice of operators making free calls for themselves, then it was estopped to assert its rules as a ground for discharge or else it became subject to an equitable duty to warn the operators to cease the practice before discharging them. This argument can be separated into two parts. The first part, resting upon an estoppel theory, requires a finding of fact that Mountain States actually knew the true facts about appellants' use of their facilities to make toll-free long distance calls. However, as noted above, the appeals examiner and the Industrial Accident Board both found on substantial evidence that Mountain States did not have such specific knowledge of the practice as to justify a finding that the practice was condoned.

■ There are other difficulties with this theory as well. By appellants own definition of estoppel,[13] the party relying upon the acts of the party who is to be estopped must be "excusably ignorant of the true facts." Appellants here were fully in possession of all the facts relevant to their duty not to make free calls for themselves. All the operators knew their duty was to make tickets for all toll calls, including their own, but they neglected this duty because the "operator's privilege" happened to have been taken for granted by others before them.

■ Moreover, the party seeking to estop another must have a "right to rely" upon the other's actions. Appellants apparently contend that they might have relied upon certain communications of Mountain States of a negative character, that is, the fact that Mountain States did not send a

4. I.C. § 72–1366(f).

5. Johns v. S. H. Kress & Company, 78 Idaho 544, 548, 307 P.2d 217, 219 (1957).

6. Ibid.

7. Custom Meat Packing Company v. Martin, 85 Idaho 374, 379 P.2d 664 (1963).

8. Doran v. Employment Security Agency, 75 Idaho 94, 267 P.2d 628 (1954).

9. Watts v. Employment Security Agency, 80 Idaho 529, 335 P.2d 533 (1959).

10. Oliver v. Creamer Heating & Appliance, 91 Idaho 312, 420 P.2d 795 (1966).

11. Rasmussen v. Gem State Packing Company, 83 Idaho 198, 360 P.2d 90 (1961).

12. O'Neal v. Employment Security Agency, 89 Idaho 313, 404 P.2d 600 (1965).

13. 28 Am.Jur.2d Estoppel § 27 (1966).

**512**

representative to Malad on a frequent and periodic basis to tell the operators not to make free calls. Yet the Gray Book contained the rules against making unticketed calls, and each operator received a copy of these rules and knew their substance. These rules were the essence of their employment. In these circumstances, appellants could not rely upon their employer's silence or inaction. They could not infer from this silence or inaction a policy directly contrary to written rules already known to them. Such is not the function of estoppel.[14]

The second part of appellants' last legal argument is that Mountain States became subject to a kind of equitable duty to warn the operators to cease their practice before it discharged them. Appellants would have us imply this duty from "equity and fairness." Though this argument has appeal, we must find it essentially unsound.

This contention is in essence that Mountain States had a legal duty to choose a particular form of discipline from its hierarchy of disciplinary measures. Appellants contend that there was a legal duty to warn them rather than to fine, suspend, discharge or prosecute them, for example. It should be noted preliminarily that this argument is irrelevant to the only issue decided by the Industrial Accident Board below and by this decision, namely, whether appellants were discharged for "misconduct." Substantively, however, the argument is faulty because it is wholly within the employer's discretion to mete out various forms of discipline for misconduct.[15] This Court has no legal basis upon which it could interfere with the internal disciplinary matters of an employer once

employee misconduct has been found. Fairness in these circumstances will not suffice for legal authority.

Decision affirmed, no costs allowed.

SMITH, C. J., and TAYLOR, McFADDEN and SPEAR, JJ., concur.

14. Estoppel is a doctrine of equity intended to aid innocent parties by promoting fair dealing, good faith, honesty and justice and can never be used to uphold a wrong of any character; see Pomeroy's Equity Jurisprudence §§ 805 and 813 (1941); 28 Am.Jur.2d Estoppel § 28 (1966); cf. Boesiger v. Freer, 85 Idaho 551, 559, 381 P.2d 802, 808 (1963).

15. Even the National Labor Relations Board may not interfere in company discipline where no anti-union activities are involved; see National Labor Relations Act § 8(a) (3), 29 U.S.C.A. § 158(a) (3) ; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893 (1936); National Labor Rel. Bd. v. Wagner Iron Works, etc., 220 F.2d 126 at 133 (7th Cir. 1955).