609 P.2d 144

Georgie A. OWEN, SSA 541 48 9902, Claimant-Appellant,

v.

NEWBERG CEDAR, Employer,

and

Department of Employment, Defendants-Respondents.

No. 13031.

Supreme Court of Idaho.

March 28, 1980.

Jonathan G. Ellison, Lewiston, for claimant-appellant.

David H. Leroy, Atty. Gen., R. LaVar Marsh, Deputy Atty. Gen., Boise, for defendants-respondents.

SHEPARD, Justice.

This is an appeal from a decision of the Industrial Commission denying unemployment benefits to claimant-appellant Owen. We affirm.

Owen's claim for unemployment benefits was denied at the initial determination hearing, at a redetermination pro-

ceeding, and at an appeal proceeding before an appeals examiner. Following a hearing, the Industrial Commission affirmed the decision of the appeals examiner. Although the record before this Court includes the testimony taken before the appeals examiner, it does not include any testimony taken before the Industrial Commission. Clearly the burden of perfecting an appeal lies with the appellant as does the burden of procuring a transcript sufficient to establish facts necessary to the case of the appellant. *See Kirkham v. 4.60 Acres*, 100 Idaho 781, 605 P.2d 959 (1979); *Hale v. Heninger*, 87 Idaho 414, 393 P.2d 718 (1964).

■ The Industrial Commission concluded that the claimant Owen was not laid off by her employer but that the employer had work available for the claimant and expected her to keep working. The Industrial Commission also concluded that the claimant voluntarily quit her employment without good cause and refused to accept the employer's offer of reemployment. Those conclusions are sustained by the findings of the Commission which in turn are sustained by the evidence contained in the record before us. We are compelled to defer to the findings of the Industrial Commission when they are supported by substantial and competent evidence. Id. Const. art. 5, § 9; *Guillard v. Department of Employment*, 100 Idaho 647, 603 P.2d 981 (1979).

■ The claimant cannot recover unemployment benefits after voluntarily leaving employment without good cause, I.C. § 72–1366(e), and a claimant who has voluntarily left employment bears the burden of establishing that such termination was for good cause. *Pyeatt v. Idaho State University*, 98 Idaho 424, 565 P.2d 1381 (1977). *See also Meyer v. Skyline Mobile Homes*, 99 Idaho 77, 589 P.2d 89 (1979); *Burroughs v. Employment Security Agency*, 86 Idaho 412, 387 P.2d 473 (1963).

Owen began work as a "shake packer" in the Newburg Cedar Mill in 1976. A shake packer is a member of a team including a sawyer and splitter. It appears that the sawyer is the key person in each team and acts as the supervisor. A number of such teams work at the mill and are paid on a piecework basis. On January 9, 1978, the sawyer of Owen's team quit work and left the mill which meant Owen was without work until another sawyer could be found. Owen also left the mill after failing to find the mill owner and inform him of the situation. The next day, January 10, a replacement sawyer was obtained for the team but Owen did not appear at work. The mill owner was required to construct a new team by the reassignment of night-shift workers.

It is clear that Owen did not return to the mill for at least six days, *i. e.*, January 15, although the record could be read to indicate that she did not return to the mill until January 23. At such time as she did return to the mill she was offered the same position as a shake packer with apparently the same pay scale. However, since night-shift workers had necessarily been assigned to the day shift to complete the shake teams, Owen would have been required to work on a night-shift team. That team included the sawyer with whom she had previously worked and who had returned to work and been assigned to the night shift. Owen complained to the owner of the mill of her dislike for working the night shift and the owner stated that he would straighten things out and contact her. Thereupon she left the mill and never returned. In the meantime she had filed for unemployment benefits on January 10, 1978.

■ While Owen's actions on January 9 may well have constituted a leaving with good cause, on January 10, 1978 the mill was fully operational and work was available for Owen. Her failure to return to work under those circumstances supports the finding that Owen voluntarily left her job without good cause. *See McMunn v. Department of Public Lands*, 94 Idaho 493, 491 P.2d 1265 (1971).

■ Owen asserts that the reason for her refusal of the offer of reemployment was dissatisfaction with Sunday night work. Owen had the burden of establishing that the offered employment was not suit-

able work. I.C. § 72–1366(g); *Meyer v. Skyline Mobile Homes, supra; McMunn v. Department of Public Lands, supra.* Owen did not carry or satisfy that burden of showing conformance with the statute, *i. e.,* that her health, safety or morals would be jeopardized or that the conditions of the night shift would have been substantially less favorable to Owen. The record is devoid of a showing that Sunday night work was, in this industry and in that area, anything other than the usual, ordinary and accepted practice. Hence there is no showing that Owen's refusal of the proffered employment was for any but personal and subjective reasons peculiar to her. *See Pyeatt v. Idaho State University, supra; Flynn v. Amfac Foods, Inc.,* 97 Idaho 768, 554 P.2d 946 (1976); *McMunn v. Department of Public Lands, supra. See generally Rogers v. Trim House,* 99 Idaho 746, 588 P.2d 945 (1979).

The order of the Industrial Commission denying unemployment benefits is affirmed.

DONALDSON, C. J., and BAKES, J., concur.

BISTLINE, Justice, dissenting.

Although those who read only the opinion of the Court will be led to believe that Georgie Owen had the benefit of counsel in her frustrated attempt to gain unemployment benefits, such is not at all the case.[1] Georgie Owen attempted to "go it alone"— and therein, perhaps, lies the cause of her undoing in the eyes of the majority of the Court. Her handwritten notice of appeal[2] can hardly be said to be in compliance with Idaho Appellate Rule 17, and other than for the compassion of the Department of Em-

ployment, the appeal probably was subject to dismissal on a number of grounds.[3]

I confess my own uncertainty as to its import, but the Court's opinion immediately picks up Mrs. Owen's failure, if such it be, to fulfill "the burden of procuring a transcript sufficient to establish facts necessary to the [her] case . . .", apropos of the preceding statement that the appeal record, although it "includes the testimony taken before the appeals examiner, it does not include any testimony taken before the Industrial Commission." However, the appeal record, as I view it, does not sustain the inference, if the Court thereby suggests one, that the omission of the testimony taken before the Commission's referee defeats or even militates against Mrs. Owen's appellate presentation. As the record shows, the only person appearing and testifying before the Commission's referee was Mrs. Owen. Were one to assume that this 54 year old common laborer somehow had a familiarity with the appellate rules which then had been in effect for only one year, even so there was no requirement on her part to bring up testimony which was not in any way essential to her case. If that is not a proper understanding of Rule 16(g), then I fear that I have been much put upon in giving my vote for the approval of that particular rule.

Likewise with Rule 19. As I understood the philosophy governing the adoption and promulgation of an entirely new body of appellate rules, it was desired to omit the unnecessary and redundant. If respondent D.O.E., however, desired to rely upon and "include portions of the reporter's transcript, . . . the respondent shall file a written request therefor." Rule 19, com-

---

1. Mr. Ellison shown as her counsel on the appeal became involved only after Mrs. Owen had brought the controversy into this Court.

2. Mrs. Owen's appeal, in no way complying with the lengthy printed form set forth as part of said Rule 17 (of which rule and form one may be reasonably certain Georgie Owen was totally uniformed), stated only "I hereby appeal to the Idaho Supreme Court the decision of the Industrial Commission. Case No. DOE–L–107–78." She signed it, and sent along $10.00.

3. Owen's employer, Newburg Cedar, has made no appearance whatever in the proceedings in this Court. The contest is solely between Mrs. Owen and the Department of Employment.

At the hearing held by the Industrial Commission's referee in Coeur d'Alene, Idaho on May 9, 1978, only Mrs. Owen appeared. The employer neither appeared in person or by counsel. It did later on ask for a second opportunity to appear, which request was denied.

plete with form of notice as a part thereof. Here the D.O.E. made no such request, nor has it suggested anywhere in its brief or at oral argument that the appeal record is deficient in any manner. Quite the contrary, D.O.E. in its brief accepted the same record sent to us by the Industrial Commission, saying (with citations to the appeal transcript which I omit):

"The Commission concluded that claimant had not done all that a reasonable person would have done to keep employed. Claimant insists we look at the entire record to determine the validity of the finding. *Let us, therefore, do so.*

"Claimant worked for this employer for over a year. Claimant was entitled to a one week vacation which she commenced on December 8, 1977, and which she arranged to extend beyond that one week. She went to Seattle at that time and did not return to Fernwood until January 3, 1978. On January 4, 1978, fellow employees came to claimant and asked her to return to work. She declined the offer because she had been sick while in Seattle and gets pneumonia easily but she told them she would return on January 9, 1978.

"After returning to work on January 9, she worked for forty-five minutes at which time the sawyer quit and she left to find her employer to see what she was supposed to do because he had quit. She called again on the 10th of January about 8:00 a. m. and was unable to reach him so she went and filed for benefits. On January 10, 1978, at approximately 9:00 a. m. the employer attempted to contact claimant to see if she was coming to work but was unable to do so because she had left town to file for unemployment benefits. The employer had no alternative but to replace her on the day shift which he did the 10th of January, until such time as she showed up for her shift."

Both the foregoing recitation taken from D.O.E.'s brief, and the opinion of the Court, make no mention of the reason for the sawyer's quitting, although D.O.E. does observe that he quit after working but 45 minutes on the morning of the 9th of January. Although the Court's opinion states that "[o]n January 10, a replacement sawyer was obtained for the team," such is not the fact, although it purports to be a fact found by the Commission's referee. (No. IV) The testimony of the employer, however, runs contrary to that finding:

"Q. And did this Ely [the sawyer] actually quit on the 9th of January?

"A. Yeah and then he went to work for Guenther.

"Q. Now let me ask you, when he quit, I don't understand everything about the cedar business, when a sawyer quits, the shift doesn't work, is this correct?

"A. Pretty close.

"Q. He is the key man? If you have no sawyer, if you didn't have any sawyers, you'd be out of business, is that correct?

"A. Yes.

"Q. *So when he quit on the 9th, then the splitterman and the packer were in effect out of a job, is this correct?*

"A. *Right.*

"Q. It's not their fault that the sawyer quit, which makes it your responsibility as the owner, is that correct?

"A. That's correct.

"Q. Okay he did quit on the 9th? And then Mrs. Owen has indicated that she made an effort to get in touch with you that evening and was unable to get hold of you, when did you get a sawyer back on the . . . ?

"A. *The next day I moved the second shift up,* and she had the right to pack days. She could have been there packing days except she never came down to the mill or never showed up, *so I put the night shift, moved the night shift packer up. He should have been laid off.* I had to have somebody there to pack.

"Q. Knowing that Ely had quit, which caused Mrs. Owen to quit that day, *did you make any effort to get in touch with Mrs. Owen?*

"A. No I figured it was her responsibility to come down to the mill and she knew that. She drives by the mill every day. She knew it was working."

In the foregoing testimony I have emphasized certain portions, which clearly sustain Mrs. Owen's contention that the evidence does not sustain any finding that she voluntarily quit or abandoned her job. The employer honestly and accurately stated that when the "sawyer quit on the 9th, then the splitterman and the packer (Mrs. Owen) were in effect out of a job." It must be remembered that shakes are manufactured by three-man crews, not employed by the month, or by the day, *but by the piece.* When the sawyer quit, Mrs. Owen became among the unemployed. The employer's wife stated it very well and very succinctly: "There is no job for a packer or a splitterman if there's no sawyer."

The employer did not just move the second (night) shift packer up, but moved the entire second shift up. He testified that Mrs. Owen "had the right to pack days," but he also admitted that he made no effort to get in touch with her. The record demonstrates a ready answer for his inertia, in that had Mrs. Owen been sought out and advised of her right to pack the day shift—with the moved-up packer from the discontinued night shift, "[h]e [the night shift packer] should have been laid off." It is entirely clear from the record that the quitting sawyer resulted in a reduction in force of one crew, and that Mrs. Owen was immediately out of a job, and either she or the night shift packer, one or the other, was going to be unemployed until the employer could find a new sawyer. The fact of the matter is, then, that it was Mrs. Owen who became unemployed when the sawyer quit, and it was the employer who, if he had sought her out to come back, would have had to let go the packer who, as the record shows, did not step into her job but came along as part of a three-man crew. In either event the employer faced the fact that an unemployed packer would be applying for the benefits which the law makes available. And the employer's own testimony evinces a display of absolutely no con-

cern whatever whether that unemployed packer was or was not Georgie Owen.

The employer's testimony also established that he had beforehand knowledge that Mrs. Owen "could not or would not work with Mr. Siler [the night shift sawyer who moved up]." There is not one shred of evidence in the record even indicating that anyone advised Mrs. Owen that the night shift crew would start out the day shift on the morning of the 10th so that Mrs. Owen at least had the opportunity to assert "her right," as the employer stated it; "when she didn't show up, I just figured that was her reason and put Dwayne on packing." [4]

The short testimony of Mrs. Owen is similar to that of the employer's and to the point. She adds that which did not gain mention in the D.O.E. recitation above, or in the Court's opinion, that the sawyer got mad and quit for the simple reason that the mill ran out of wood, which the appeals examiner found as a fact, with the Industrial Commission specifically finding the converse. How important it may be that the mill was or was not out of wood is not difficult to see. Certainly all will concede that the quitting of the sawyer reduced the mill to one shift until another sawyer could be found. But, if the mill was also out of wood, ten new sawyers found the next day wouldn't have put Georgie Owen back to work. So it seems important in understanding why the next morning she drove to St. Maries in order to file her claim for unemployment.

She knew beforehand, according to the testimony of the employer, that the sawyer moving to days probably wouldn't want her, and she was never told that he would respect "her right" to work days. She testified that there was no wood, and I am at a loss to understand just how the Commission can find, as it does, that " . . . the employer had an ample supply of wood on hand and the work did not cease for this purpose."

---

4. Neither the decision of the appeals examiner for the Department, nor the decision of the Industrial Commission shows any consideration for the fact that a sawyer might not choose to work with a given splitterman or packer, one not of his own choice. Quoting the employer, " . . . the sawyer is head man down there."

Years ago, in a case coming to this Court from the Industrial Commission, *Pierstorff v. Gray's Auto Shop*, 58 Idaho 438, 447–48, 74 P.2d 171, 175 (1937), the Court held:

"The rule applicable to all witnesses, whether parties or interested in the event of an action, is, that either a board, court, or jury must accept as true the positive, uncontradicted testimony of a credible witness, unless his testimony is inherently improbable, or rendered so by facts and circumstances disclosed at the hearing or trial. . . . neither the trial court nor a jury may arbitrarily or capriciously disregard the testimony of a witness unimpeached by any of the modes known to the law, if such testimony does not exceed probability. . . . 'Testimony which is inherently improbable may be disregarded, but to warrant such action there must exist either a physical impossibility of the evidence being true, or its falsity must be apparent, without any resort to inferences or deductions.' " (Citations omitted.)

That statement of the law has since been consistently adhered to, and approvingly quoted by this Court: *In re Estate of Stibor*, 96 Idaho 162, 525 P.2d 357 (1974); *Dunn v. Baugh*, 95 Idaho 236, 506 P.2d 463 (1973); *Reed v. Green*, 90 Idaho 526, 414 P.2d 445 (1966); *Olsen v. Hawkins*, 90 Idaho 28, 408 P.2d 462 (1965); *Nelson v. Hazel*, 89 Idaho 480, 406 P.2d 138 (1965); *National Ro-Tile Corporation v. Loomis*, 82 Idaho 65, 350 P.2d 217 (1960); *Watkins v. Watkins*, 76 Idaho 316, 281 P.2d 1057 (1955); *Anderson v. Ruberg*, 66 Idaho 417, 160 P.2d 456 (1945); and *Idaho Times Publishing Co. v. Industrial Accident Board*, 63 Idaho 720, 126 P.2d 573 (1942).

There is no testimony in this record which can be said to justify the Commission's finding that there was not a lack of wood, and hence the Commission was not at liberty to make a finding directly into the teeth of claimant's testimony. On the contrary, after she succinctly stated on her application that the reason for her becoming unemployed was "no sawyer—laid off," the employer resisted her claim with this manifestly untrue statement:

"She took 3 weeks off. Came to work *and the new sawyer was late* so she returned home and never came back to work. *We had to hire someone to take her place.* She didn't even notify us she had quit. There was work and we were not laying anyone off at this time."

As a result of those statements, which did not admit that the sawyer had indeed quit, and misstated that someone had to be hired to take claimant's place, the Department's claims examiners, accepting the statements at face value, denied Mrs. Owen's claim out of hand, determined that she had voluntarily quit without good cause, and explained to her that "the fact that the new sawyer was late on the first day you returned to work after your vacation does not demonstrate that your only recourse was to quit."

This determination was to unfairly place the claimant in a hole from which she was not thereafter going to be able to extricate herself. But she tried. On her further effort the redetermination examiner concluded that she had not only quit her job on January 9th, but, going into the later developments mentioned in the Court's opinion, he concluded that she was guilty of not just the one, but two voluntary quits, both without good cause.

In due time, after the prodigal sawyer made his return, claimant was solicited to join his crew, as night packer, his ways having caused his reduction to that shift. She testified, without contradiction, that when he talked with her he had not yet found a splitterman, and that she advised him that she would rather work Friday nights than Sunday nights. He was to come to her house Sunday morning at 9:00 a. m. and discuss the arrangements further, but, according to her, he didn't show until 11:00 a. m., with her in the tub, and not able to answer the door until he was leaving. No planned discussion took place between those two. Instead she talked with the employer, and stated she would be at work Monday at 4:00 p. m. for the night shift. When she reported to work, however, the sawyer told her, "If you don't

want to work Sundays, get out of here." She went to the employer and reported the incident, receiving his assurance that he would straighten it out and stop by her house and let her know.

The finding of the Commission's referee, adopted and approved by the Commission, is in almost all respects exceedingly accurate, amounting to a near resume of claimant's testimony. Finding V:

"On or about January 23, the claimant was contacted by the sawyer who originally quit. He had agreed to return on the night shift and asked the claimant if she wanted to work. She initially agreed to do so, although she did not want to work the weekly schedule that the sawyer planned to work. Later, the claimant and the sawyer were unable to agree to a schedule satisfactory to the claimant as she did not want to work on Sunday nights. The claimant then talked to the employer on January 23, 1978, but the employer was not able to change the schedule because he had to accommodate the sawyer. As a result, the claimant did not return to work."

It is to be observed, however, that long prior to the 23rd of January, the employer had received from the Department a copy of claimant's Statement Regarding Separation, and had mailed in the response above set forth. The Department's appeals examiner carefully established that from the time the wood ran out and the sawyer quit in a fit on the 9th of January, *there was no contact* between claimant and the employer:

"Q. Okay, during that period of time, from the 9th until the 23rd, then you had no contact with Mrs. Owen?

"A. Right.

"Q. She didn't contact you for work *and you didn't check to see what her status was?* . . ."

The last question, more in the nature of a statement than a question, was not answered by the employer, as the examiner, without waiting for an answer, then asked the employer to state what happened on the 23rd. (The employer knew she was in the process of seeking unemployment benefits.)

The answer given by the employer established at least two things: the employer himself did not even pretend to have re-hired the claimant. He stated that she and the returning sawyer conversed on Monday morning, the 23rd, where he became informed that claimant and the sawyer had not met on the previous day, Sunday, and he, the sawyer, "didn't know if she was gonna work or not." The employer then sought out claimant, who said "yes" she was going to work, and "okay" she knew she didn't get to work days. She stated a preference for a shift which included Friday nights rather than Sunday nights, whereupon the employer declared himself out of it, saying "that will have to be between you and Ken, the sawyer is head man down there, and he can run his work on that basis if he wants to." Clearly the employer did not employ the claimant, leaving it entirely to the choice of the sawyer as to whether she would be again employed at the mill. Claimant never did say that she wouldn't work Sunday nights, she only stated that she didn't want to. The employer's wife in her testimony verified that Mrs. Owen only "*asked* to go back on days and *wanted* us to get rid of the day packer and put him on nights, so they could change places." This *request* was not honored simply because " . . . when she didn't show up for work on the 10th, it wasn't our place [5] *to ask* him to take night shift."

---

5. Shake crews apparently have an unwritten code of "right" and "place"—a pecking order of sorts. Mrs. Owen had a "right" to work days, provided she had been advised to come to work the morning of the 10th, which she admittedly was not. So the night packer gained the "right" to have days, and, notwithstanding that the mill was in operation on the 10th without Mrs. Owen, two weeks later, during which time she had not been contacted by any one, it was not the "place" of the employer to even request of the other packer that Mrs. Owen be restored to days—which surely was her "right," and taken from her only through the actions of the owner in running out of wood, and the actions of the sawyer in quitting—over all of which claimant had no control whatever.

The record is free of any evidence that Mrs. Owen was ever employed a second time at Newburg Cedar—making it a decided impossibility that she was guilty of a second voluntary quit, as held by the Department's appeals examiner. This was recognized by the Industrial Commission's referee, who did not find a second period of employment, and a second quit—but found against Mrs. Owen, as to this affair of the 23rd, on the basis of his conclusion (part of No. III) that "she did not accept re-employment offered to her on or about January 23, 1978"—which conclusion is supposedly said to flow from Finding V above set forth verbatim.

The purpose of Finding V and Conclusion III is not readily understood. If the Commission correctly found, on substantial evidence, that Mrs. Owen was guilty of a voluntary quit, she was thereby rendered ineligible for benefits, and what took place on the 23rd was of no consequence whatever.

At some pains, and going to some length, it is found to be abundantly clear, however, that there is no competent substantial evidence in this record to sustain the Commission in its ultimate holding that Georgie Owen voluntarily quit her employment with her employer, Newburg Cedar, on January 9th. On the contrary, the record firmly establishes that this 54 year old worker, who doing hard physical and seasonal work in the previous year had grossed over $7,000, was out of employment when her sawyer quit to move on with another mill— because of a lack of wood.

The record shows that on the initial submission of her claim the employer misstated that she left on the occasion of the sawyer being late for work—which misstatement was never retracted by the employer or challenged in any way by the Department.

There being insufficient evidence to sustain the Commission in its findings and conclusions, the decision of the Commission should be reversed with directions to enter findings and conclusions and award of benefits in favor of claimant insofar as her termination from employment on January 9, 1978, is concerned. *Mata v. Broadmore Homes*, 95 Idaho 873, 522 P.2d 586 (1974); *Alder v. Mountain Telephone & Telegraph Co.*, 92 Idaho 506, 446 P.2d 628 (1968).

Following his conversation with claimant on the 23rd, the employer then betook himself back to the sawyer, advising him to "figure it out which way you want and if she doesn't want to work Sunday, then tell her that if she's not gonna be here every day, just tell her to go home and we'll find somebody else . . . because I can't be down here babysitting."

The only testimony in the record as to the final conversation between claimant and the sawyer, briefly alluded to earlier herein, was that of claimant, and it is a logical extension of the fruitless negotiations on the stage as set by the employer:

"A. . . . So I went up where the sawyer was and he asked me what the hell I did, if I hid from him Sunday? And I said 'no' and told him why I didn't answer the door because I was in the bath tub.

"Q. This was Ely, the sawyer?

"A. Yes, the same sawyer. And he says 'If you don't want to work Sundays, get your goddammed ass out of here.'"

The Commission's conclusion (No. III) that claimant "did not accept re-employment offered to her on or about January 23, 1978," should also be set aside for lack of substantial evidence to sustain the same, and equally for lack of legally sufficient underpinning of findings. Finding V of the Commission, while it correctly states with supporting evidence that the sawyer and claimant were unable to reach an agreement of employment terms, fails to state that claimant did not refuse to work Sunday nights, but in fact did say that she would do so, even though she wanted to work days, and *wanted* to be changed with the packer who had acquired her day "rights." Moreover, there appears to be another reason for setting aside this conclusion of the Commission. The Department's appeals examiner, whose decision was that claimant on two occasions voluntarily quit without good cause, went well beyond the

issue he was supposed to hear in making the determination of the second quit. If he was on sound ground in finding a first quit, the second quit was a surplus issue. It also was not the issue which he was to hear. *White v. Idaho Forest Industries*, 98 Idaho 784, 572 P.2d 887 (1977). If that be an incorrect reading of Department procedures and notices, nevertheless, where no issue of refusing to accept suitable work was before the appeals examiner, the matters to be determined by the Commission, according to its notice of hearing, were "all issues considered by the Appeals Examiner." The Commission was absolutely correct in rejecting the appeals examiner's decision of a two-fold quit, but as equally incorrect in reaching a determination against claimant on the basis of her supposedly refusing reemployment.[6]

The Court's opinion comes very close to stating that claimant's actions on the 9th were justified as a leaving with good cause, but goes on to say that she failed to return and thereby voluntarily quit without good cause. It is beyond dispute from the record to which resort has been made, and portions of which have been set forth herein, that this was not a case of a claimant leaving employment, and certainly not a voluntary quit without good cause. Counsel who have undertaken claimant's appellate presentation have guided us to the Department of Employment Policy Manual, Voluntary Leaving Position § 290 "Leaving Without Notice Thereof," stating: "The cause of the leave of work and not the manner of leave is the primary consideration in respect to a voluntary leave of work."

Following that citation it is urged:

"The fact that work became available on the following day does not alter the claimant's circumstances at the time she left work. At that time she was without work and, being paid on a piecework basis, without income. At the least this made claimant's leaving involuntary, and should have required the employer to notify claimant of the resumption of opera-

tions. The question of voluntary leaving depends also on which party initially 'causes' the leaving. Here again it is instructive to turn to the Department of Employment's Policy Manual. Employer Chargeability Division, 135 Discharge or Leaving: 'Generally when a *worker sets in motion* the series of events that lead to his separation, it may properly be held that it is a voluntary quit on his part.' (Emphasis supplied) Contrast this statement with the opposite situation set out in the Misconduct Division, 135.3 Involuntary Separation: 'If the separation from the employment status is wholly involuntary upon the part of the worker, voluntary leaving of the work is not assumed. If the *employer creates the situation* which causes the separation in such cases, a discharge is generally assumed to have taken place.' (Emphasis added) By failing to provide enough wood on January 9th, the employer in the case at bar 'created the situation' which led to the claimant's leaving.

"The guidelines set forth in the policy manual make references throughout based on who 'caused' the situation, what circumstances 'compel' the severance, etc. while the Industrial Commission in the present case totally ignored the initial cause of the severance.

"In the Voluntary Leaving Division of the Manual significant references to what caused the leaving continue. Under § 135 Discharge or Leaving, severances are classed as either dismissal or leaving, 'The first being severance from the work through some act or omission of the employer, including a *failure to supply work*. The other constitutes a leaving of *existing* work by worker.' (Emphasis added) This is precisely what occurred on January 9th—the employer failed to supply enough work for the shift that day. The claimant was then forced to leave her employment after the sawyer's disenchantment with the employer's lack of organization led the sawyer to quit.

6. Department in its brief asserts: "Since she quit her employment without good cause this question is really immaterial." The Court's opinion nonetheless addresses the issue.

"Finally under the Voluntary Leaving Division, § 495 Voluntary, the manual states: 'A leave is not usually voluntary when the employer severs the employment status or when the employer so acts as to force an apparent voluntary severance. If any circumstances arise which actually compels the severance, the voluntary factor with respect to the individual may well be doubted.' After thoroughly reviewing the policy manual it appears that the Industrial Commission has failed to adequately consult its own policy manual. The numerous references in the manual to the causes that initially lead to separation as opposed to what appears to be the Commission's policy to place total responsibility on the employee and then examine only post-separation actions presents a confusing picture of the decision-making process at best. Clarification of the Commission's position is required where, as here, they base their decisions on an extremely narrow interpretation of 'voluntary leaving' without any explanation."

Claimant's argument is not only sound, but all the decisions which have been made on her claim, as it progressed upward, were erroneously founded on the false premise that she quit her employment. The record mandates otherwise. When a shake packer is out of wood, or out of a sawyer, that shake packer is out of work. As to what happened thereafter, this employer's position was that " . . . it was her responsibility to come down to the mill . . " in regard to which assertion the employer advanced no substantiating reason. In evaluating the situation, it has been pointed out above that the employer was faced with the stark fact that, should he have sought out claimant and reinstated her as packer for the sawyer moving up from nights, he then still had an unemployed packer, simply because there could be only one shift until another sawyer was found. As claimant's counsel correctly perceives in her brief with helpful reference to the Department's manual:

"An employee-employer relationship must be maintained with a balancing of responsibilities, as is recognized by the Department of Employment. In its Policy Manual, under the Able and Available Division, § 165 Employer Requirements, .05 General: 'Throughout this policy manual it is stressed that a claimant is expected to do what is reasonable and customary. The same is expected from an employer.'"

In conclusion I add only that I see nothing in law or logic which prohibits a claimant from going to the Department's office the day after her employment has ended in order to begin the processing of her claim, and I see nothing in law or logic which allows her to be penalized for doing so. Where the mill was thereafter obviously and openly running only a day shift, without her, after her sawyer had quit, I find it totally wrong to uphold a determination which says that although her employment may have ended, her failure to return (attempt to return would be better put) somehow supports a holding that she voluntarily quit her employment on the 9th, and without good cause. It is a non sequitur in reverse.

Papel y tinta y un poco de justicia. I dissent.

McFADDEN, J., concurs.